JOHN T. TAYLOR v. TERRITORY.

No. 319.   Opinion Filed February 3, 1909.

(99 Pac. 628.)

1. **FALSE PRETENSES — Indictment — Sufficiency — Reliance on Representations.** An indictment for obtaining money by false pretenses, charging that the defendant falsely and fraudulently represented that he was the owner of certain lots, etc., which fails to allege that the prosecuting witness was thereby induced to, and did, loan the defendant said sum of money, is fatally defective, and a general demurrer thereto should be sustained.

2. **SAME—Indictment—Sufficiency.** In an indictment for obtaining money by false pretenses, the absence of a direct and positive allegation in the description, substance, nature, or manner of the offense, the ambiguity and uncertainty of the language used, cannot be supplied by intendment, argument, or implication.

3. **TRIAL—Province of Court and Jury—Direction of Verdict.** If there is any evidence tending to prove that the defendant has committed the offense charged in the indictment, it is not error for the court to overrule defendant's motion, at the close of the evidence, requesting the court to advise the jury to acquit the defendant on the ground that the evidence is insufficient to warrant a conviction.

4. **FALSE PRETENSES—Evidence—Sufficiency.** In a prosecution for obtaining money by false pretenses, the defendant cannot be convicted if the false pretense was expressed in language alone, unless the pretense be proven by the testimony of two witnesses, or that of one witness and corroborating circumstances. Held, that under the evidence in this case the testimony of the prosecutor was not sufficiently substantiated by the second witness, or by corroborating circumstances.

2 Cr.—1

5.     **SAME—Nature of Pretense—False Promises.** The false pretense must be the assertion of an existing fact, and not a promise to perform in the future.

(Syllabus by the Court.)

*Error from District Court, Logan County; A. H. Huston, Judge.*

John T. Taylor was convicted of obtaining money by false pretenses and he brings error. Reversed.

*C. G. Hornor*, for plaintiff in error.—

On sufficiency of indictment: Hughes' Criminal Law, § 635; *Redmond v. State*, 35 Ohio St. 81; Wharton's Criminal Law § 1215; *Com. v. Strain*, 10 Metc. 522; *State v. Orbis*, 13 Ind. 569; *State v. Philbrick*, 31 Me. 401; *State v. Green*, 7 Wis. 676.

On question of variance: *Briscoe v. State*, 4 Tex. App. 221; Bishop's Crim. Proc., § 140 (1st Ed.); *Curry v. State*, 4 Tex. App. 574; Wharton's Criminal Law, § 1195 *et seq.; Regina v. Brady,* 26 U. C. Q. B. 13; *Regina v. Brian*, 2 F. & F. 567; *Com. v. Howe*, 132 Mass.; *Kennedy v. State*, 34 Ohio St. 310; *Bonnell v. State*, 64 Ind. 498; *State v. Baggerly*, 21 Tex. 757.

*Charles West*, Atty. Gen., and *Charles L. Moore*, Asst. Atty. Gen., for the Territory.

DOYLE, JUDGE. John T. Taylor, plaintiff in error (hereinafter designated as defendant) was, without preliminary complaint or examination, indicted in the district court of Logan county, Okla. T., September 26, 1907, and was tried and convicted in the district court of Logan county, Okla., for the crime of obtaining money by false pretenses, and on April 3, 1908, he was sentenced to the state penitentiary for the term of one year at hard labor. From this judgment defendant appeals. Numerous assignments of error are presented by the petition. Those argued in the brief are "error of the court in overruling the demurrer to the indictment; admitting incompetent, and rejecting material, testimony: that the verdict is not supported by sufficient evidence and is contrary to law; and error in overruling the motion for a new trial."

After a careful examination of the record, the conclusion of the court is that the judgment in this case cannot be permitted to stand. In the first place, the indictment is insufficient. The Attorney General has filed a confession of error and motion to remand in the case, which motion, omitting the formal part, is as follows:

"Comes now the Attorney General of the state of Oklahoma, in the cause above entitled, and states that in his opinion certain reversible errors of the district court of Logan county, from which said cause was appealed, are manifest from the record, and render nugatory and void its proceedings in said cause, in that the indictment upon which the trial was had, and upon which the verdict of the jury and judgment and the sentence of the court are predicated, does not allege facts sufficient to charge the plaintiff in error with a public offense. For the reasons stated, should the court hold said indictment insufficient, it is hereby confessed, for and upon behalf of the state, that the motion of plaintiff in error for a new trial should be sustained, and the cause remanded to said district court with directions to enter such orders therein as may be proper in the premises. Chas. West, Atty. General. Chas. L. Moore, Asst. Atty. General."

The defect in the indictment is that it fails to allege that the false pretenses set forth were relied upon by the complainant, or that he was thereby induced to make the loan when so made. To constitute the crime under our statute, three things are essential: First, a false representation as to an existing fact; second, a reliance on that representation as true; and, third, it must be the moving cause which induced the owner to part with his property.

The language of the charging part of the indictment is:

"That at and within the county of Logan, territory of Oklahoma, and then and there being on the 23d day of August, in the year of our Lord one thousand nine hundred and five, one John Taylor did then and there unlawfully, fraudulently, designedly and feloniously, with intent to cheat, wrong and defraud W. M. Ayres out of the sum of five hundred dollars ($500.00), of the value of five hundred dollars ($500.00), in good and lawful money of the United States, obtained from the said W. M. Ayres, of the

property of the said W. M. Ayres, the said sum of five hundred dollars ($500.00), by then and there fraudulently, designedly, unlawfully and feloniously representing to the said W. M. Ayres, that he, the said John T. Taylor, was the owner of certain lots, to wit, lots seven (7), eight (8), nine (9), ten (10), eleven (11) and twelve (12), in block thirty-five (35), in that subdivision of the city of Guthrie, known as Capitol Hill, in Logan county, Oklahoma Territory; and also that he, the said John T. Taylor, was the owner of certain other valuable property in the city of Guthrie in that part of the city of Guthrie known as, and designated as the Egg; and also that he, the said John T. Taylor, was the owner of valuable property located at Chandler, in Lincoln county, Oklahoma Territory, from which said Chandler property he, the said John T. Taylor, was then and there receiving a rental in the sum of twenty dollars ($20.00) per month, which said representations on the part of him, the said John T. Taylor, were then and there false and fraudulent, as he, the said John T. Taylor, was not the owner of the above described property, or any other property in the county of Logan or in the county of Lincoln, Oklahoma, as he, the said John T. Taylor, then and there well knew; but that he, the said W. M. Ayres, believing said representations that the said John T. Taylor was the owner of the above set out and described property, and believing that the said John T. Taylor was a man of wealth and well able to pay his debts and obligations, was induced to, and did then and there loan to him, the said John T. Taylor, the said sum of five hundred dollars ($500.00), as aforesaid, which said sum of money was then and there the property of the said W. M. Ayres, and which said five hundred dollars ($500.00) was then and there paid to him, the said John T. Taylor on the said loan, by the said W. M. Ayres."

It is not charged that the defendant pretended or represented himself to be "a man of wealth and well able to pay his debts and obligations," and it is not set forth that, by reason of the false pretenses regarding the ownership of the lots in Guthrie or property in Chandler, complainant was thereby induced to make the loan. Had the indictment omitted the allegation, "and believing that the said John T. Taylor was a man of wealth and well able to pay his debts and obligations," and at least alleged

"that the said W. M. Ayres was thereby induced to and did then and there loan to him," etc., it would have been sufficient. The language of the indictment is not a direct and positive allegation. It is merely an argument or inference that the owner of a few suburban lots in Guthrie would necessarily be a man of wealth and well able to pay his debts and obligations. All the authorities on criminal pleading agree that the absence of a direct and positive allegation in the description, substance, nature, or manner of the offense of false pretense cannot be supplied by any intendment, argument, or implication. The ambiguity and uncertainty of the language used in charging this essential ingredient of the offense is a fatal defect. The money must be distinctly averred to have been obtained by means of the false pretense. *State v. Hurst,* 11 W. Va. 54; *State v. Paul,* 69 Me. 215; *State v. Chapel,* 117 Mo. 639, 23 S. W. 760; *State v. Connor,* 110 Ind. 469, 11 N. E. 454; *Bryant v. Comw.,* 104 Ky. 593, 47 S. W. 578; Whar. Crim. Law, § 1227.

Second. "The said court erred in refusing, upon defendant's motion, at the close of the evidence of the prosecution, to advise the jury that the evidence of the prosecution was not sufficient to make out or establish a public offense against the defendant and directing the jury to retire and consider of their verdict on such advice of the court." Under this assignment it is contended that the evidence offered was insufficient to prove an offense, and that there is a fatal variance between the allegations in the indictment and the evidence. The prosecution is based on section 2517, Wilson's Rev. & Ann. St. 1903, which provides:

"598. Every person, who with intent to cheat or defraud another, designedly, by color or aid of any false token or writing, or other false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money or property, is punishable by imprisonment in the Territorial prison not exceeding three years or in a county jail not exceeding one year, or by fine not exceeding three times the value of the money or property so obtained, or by both such fine and imprisonment."

In this case it is not contended that the verdict complained of was "by color or aid of any false token or writing," but by a supposed false pretense included within the general clause "or other false pretense." The testimony of two witnesses was offered. W. M. Ayres, as shown by the record, testified, in part, as follows:

"Q. Are you acquainted with Capt. Taylor? A. Yes, sir. Q. How long have you known him? A. Well, I guess about three years. Q. Did you know him prior to August 23, 1905.? A. Oh, I met him several times, he kind of made a friend of me; yes, sir. Q. At the time you first met him, what were you doing here? A. Oh, I was looking after a piece of land I had foreclosing a mortgage on a piece of land over here at Waterloo. Q. How long did you say you knew Taylor before the 23d of August, 1905? A. Oh, maybe about a year. Q. How frequently had you seen him in that time? A. Oh he was on the street every few days. I was back and forth to Oklahoma City. I wasn't here all the time. Q. Had you had any conversation with him in that time? A. Oh, yes. Q. On how many occasions? A. Oh, a good many, he pretended to be a friend of mine. Q. Did you have any business transaction with him on the 23d of August, 1905? A. Yes, sir. Q. What transaction did you have? A. He borrowed $500, made a loan of me for 60 days. Q. How did you pay him? A. Well, with a check. He had the note and check himself— Q. At the time you gave him the check, state what. if anything, he gave you. A. He gave me his note. Q. You may state to the jury, Mr. Ayres, the conversation leading up to that transaction. A. Well, he says, 'Mr. Ayres, meet me down here at Weinberger's,' he says: 'Get on the street car and come out. I want to show you my lots on Capitol Hill. Well, that's fine.' I got on the car and went out with him. Now, we went through the park, down there on the north side of the park. Mr. Reed lived in a tent, and we went there, and he says: 'This is Mr. Ayres, from Ohio. I brought him out to show him my lot. Now, Mr. Reed, I wish you would help me find the corner stone.' And Mr. Reed looked around and finally found it. Now, he pointed in a southeasterly direction. He says, 'These are my lots,' and he says, 'I own six across the branch on Mansur and Walnut, and I own a property in Chandler bringing $20.00 a month that I can sell any time.' That was the conversation between me and Mr.

Reed and Taylor, and is what Taylor told me and Reed. Q. What other conversation did you have? A. Well, we left Mr. Reed there, and we went across the branch, and he showed me up them lots, and I did say this, I asked him, 'What do you consider these lots worth?' 'Oh,' he says, 'the cheapest $500 apiece.' That is all that was said, and we went off and took a car and got off at Jake Weinberger's, and he says: 'Ayres, come down to the house, I want to have a little talk with you.' Well, I went down. Now, he says: 'I suppose you heard I drawed a claim in Utah?' I says: 'Yes, I heard you did.' He says: 'I will tell you what I want. I have got $2,000 now, and want to borrow $500 more. I want to buy a town site. I was on the town-site board here and understand the business. If I don't buy a town site, I can just bring this money back and pay you; but, if I do, I will sell my Chandler property, 10 days after I get back. I will make a sale of the Chandler property.' All that nice talk; he had the note and check all fixed up. Q. Now, after you left those lots, where did you go? A. We, we left Mr. Reed, he went back to the tent, and we went across the branch, and he showed me six there. Q. The deal was made here at Capt. Taylor's house? A. Yes, sir. Q. Where were you when he first made the proposition to you to loan him that money? A. Why, it was right in the house. He took me out to the park and shows me up the property, and then we went down to the house, and then there is where we closed up the deal. There was nothing said. I didn't know what he was driving at until he got down to the house, and he put up such a nice story—"

He also testified that he was induced to give the check for $500 on the aforesaid statements and representations of defendant, and that the defendant did not own the property described. The foregoing is, in substance, the testimony of the complainant. The record shows the following admission:

"By Mr. McGuire: Mr. Hornor, will you admit you got the money on this check, or will I have to bring the bank officials here to prove it? By Mr. Hornor: I presume that is the check, and, if it is, I presume we got the money on it."

Wilson's Rev. & Ann. St. 1903, § 5498 (Code Cr. Proc. § 362), provides, in prosecutions for false pretenses, as follows:

"Upon a trial for having, with an intent to cheat or defraud

another designedly, by any false pretense, obtained the signature of any person to a written instrument, or having obtained from any person any money, personal property or valuable thing, the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof, be in writing either subscribed by, or in the handwriting of the defendant, or unless the pretense be proven by the testimony of two witnesses, or that of one witness and corroborating circumstances."

In compliance with the foregoing rule in cases of this kind, the prosecution produced the second witness, LaFayette Reed, who testified, in part, as follows:

"Q. Are you acquainted with the defendant here? A. Capt. Taylor? Yes, sir. Q. Do you know Mr. Ayres? A. Yes, sir. Q. State whether or not you saw these two men on this date, 23rd of August, about that time. A. I think it was about the middle of August. I couldn't swear to the day. Q. Now, just state what transpired there, Mr. Reed. (Objected to as incompetent, irrelevant, and immaterial, which objection was by the court overruled, to which the defendant excepted.) A. Mr. Ayres and Mr. Taylor came to my tent. Mr. Taylor introduced himself as Mr. Taylor, and introduced Mr. Ayres as Mr. Ayres, from Ohio, and in the meantime he mentioned that he was sometimes called Capt. Taylor, and he was speaking, I took it— By Mr. Hornor: Never mind what you took it— By Mr. McGuire: State what was said, Mr. Reed. A. He told me and Mr. Ayres that he owned a number of lots in the park, and also that he owned a nice property in Chandler that was bringing him in about $20 a month that he could sell at any day— Q. What else was said, if anything, Mr. Reed? A. We were talking about lots, and he spoke of a corner that was near there, and that I knew where the corner was, and I told him I could show him the corner, and I stepped up to the corner with them. It was about 60 yards, I think, from my tent. Q. What did you do when you got up there? A. I looked around a moment and found the corner and showed it to him, and, while we were standing there at the corner, he remarked, he says, 'There are my lots laying right in here.' Q. What further, if anything, was said? A. I believe that is about all that was said that I remember, and they went off in a westerly direction, him and Ayres."

Applying this test none of the pretenses alleged were sufficiently substantiated. It was necessary for the prosecution to connect the representations with the final transaction. This could, at best, be only inferred. However, if there is any evidence tending to prove that the defendant has committed the substantive offense charged in the indictment, the court should submit the case to the jury. Section 5509, Wilson's Rev. & Ann. St. 1903, provides:

"373. If, at any time after the evidence on either side is closed, the court deem it insufficient to warrant a conviction, it may advise the jury to acquit the defendant. But the jury are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict."

Defendant's motion was addressed to the sound discretion of the court, unless the variance between the allegations in the indictment and the evidence offered was fatal. The charge is that defendant obtained $500 in money; the evidence is that he obtained a check. The material question is: Did this evidence support the charge? The statute provides that "any person, who with intent," etc., obtains any "money or property" from another, shall be punished, etc. This statute specifically designates money and property, and under the general rule in such cases the evidence should conform to the allegation. The words of the statute are descriptive, and it is a rule of criminal pleading and practice that whatever is descriptive is essential. The reason of the rule is that the defendant is entitled to have the charge against him specifically designated and described, not only that he may know what to defend against, but to the end that, in case of either conviction or acquittal, he shall not be subject to again be put in jeopardy for the same offense for which he has been once tried.

In Wharton's Crim. L. § 1221, it is said that:

"The description of property obtained is required to be the same as in larceny. If a signature to negotiable paper be obtained, it must be stated as such."

In section 1222 it is stated that:

"The property obtained must be identified so as to protect the defendant in case of a second prosecution."

In pursuance of that view, it has been held that the proof must establish the obtaining of the very property alleged in the indictment, or some part of it; that an allegation of obtaining money is not satisfied by proof of obtaining some other property even so nearly the equivalent of money as evidences of money indebtedness, or orders to pay money. *Schleisinger v. State,* 11 Ohio St. 669; *Baker v. State,* 31 Ohio St. 314; *Com. v. Wood,* 142 Mass. 459, 8 N. E. 432; *Queen v. Bradley,* 26 U. C. Q. B. 13. There is a conflict of authority upon this question that cannot be reconciled. We believe the safe rule is to require the pleader, whenever an instrument enters into the offense, as a part or basis thereof, to set out, in substance at least, the said instrument.

Third. "That the verdict is not supported by sufficient evidence, and is contrary to law." Under this assignment, it is contended that the evidence, as a whole, is insufficient to sustain the verdict.

The defendant, testifying on his own behalf, in substance, testified as follows: That he was 64 years of age; had lived in Guthrie for 19 years; and in June, 1905, drew a number at the Government Land Opening, at Grand Junction, Colo. That upon his return to Guthrie, Mr. Ayres spoke to him about drawing this number, while he was waiting for a car to go out to Highland Park and said that he would go with him if he had no objections. That while at Highland Park they met the witness Reed, and in the conversation defendant stated that he had been a member of the government town-site board of the city of Guthrie, and that the title to all the lots in Guthrie was then vested in the board of which he was a member. He says that he did not utter one word indicating that he had any right, title, or interest in any Guthrie property at that time, or that he owned any property in Chandler. That he and Mr. Ayres then took a street car and went from Highland Park to Electric Park, and that while there Mr. Ayres suggested that there might be some money made in locating a town site in Utah, and told him that he had $800 in Joe McNeal's bank that he wanted to invest so as to make some money. That

on the next day, as he was going home from the post office, he again met Mr. Ayres, who again suggested to him that, with his experience in town-site work, some money might be made out in Utah. That he (defendant) suggested that, if a relinquishment could be bought low down in number so a good selection could be made, some money might be realized out of it. That it was then agreed by and between them that they would go into a speculation of this kind. They went on to defendant's house, where he introduced Mr. Ayres to Mrs. Taylor, defendant's wife, and there it was agreed that defendant, upon his return to Utah, should purchase a relinquishment for Mr. Ayres; Mr. Ayres agreeing that he would pay a part of the expense of defendant's trip to Utah. That Mr. Ayres gave defendant a check for $500. Then defendant suggested that he ought to give Mr. Ayers something to show he had received this money from him, and then he wrote a note, signed and gave it to Mr. Ayres. In a day or two he went to Utah to file on his claim, and while there purchased a relinquishment for Mr. Ayres. That upon his return to Guthrie Mr. Ayres refused to accept the relinquishment and made threats that, unless he returned the entire amount, he would have him indicted, and also refused to settle for his share of the expense of defendant's trip. This testimony is corroborated by defendant's wife, as to what the contract was.

The testimony of Mr. Burnsdale, a witness for defendant, shows that he was present some time prior to August 23, 1905, during a conversation between Mr. Ayres and defendant, wherein Mr. Ayres said to defendant, "the reason you have confidence in the future of Guthrie is that you own property, or have property to sell," and to which defendant replied, "I don't own a foot of property in Guthrie," or words to that effect. Several character witnesses also testified to the good character of the defendant during the 19 years he had lived in Guthrie.

While it is a rule approved by this court that, where there is any evidence to support a conviction, or where the evidence is conflicting, this court will not review the record for the purpose

of ascertaining or determining the weight or sufficiency of the evidence, and, ordinarily, the verdict approved by the trial court will be allowed to stand, a case of this character, however, is exceptional. We have carefully examined and fully considered all of the testimony, as shown by the record, and we are of opinion that the evidence is not sufficient to sustain the verdict. In order to justify a conviction upon a trial of an indictment for false pretenses, it must appear that the prosecutor parted with his money by reason of some of the pretenses set forth in the indictment, or, if not solely by reason of such pretenses, that they at least materially influenced his action. In the absence of evidence that the prosecutor relied upon the pretenses charged, the essential averment in such an indictment (that the defendant obtained the money by reason thereof) would not be supported; and, while it is not necessary that this fact should be shown by direct proof, it is competent to establish it by direct declarations of the prosecutor, and, in the absence of direct proof, it may be inferred from the facts and circumstances proved. Under our statute, it is necessary, before the defendant can be convicted, where the false pretense was expressed in language alone, that it be proven by the testimony of at least two witnesses, or of one witness and corroborating circumstances. In this case the corroborating witness was not present when the transaction was consummated, and there are no corroborating circumstances. When the defendant and Ayres were with the witness Reed, the matter of a loan had never been mentioned, and, while the law may impute to the person making a false pretense a design from the beginning to consummate the result, we believe that the declarations testified to were not, under the circumstances in which they were made, false pretenses within the meaning of the statute. The representation must be not only false, but fraudulent. Under the testimony of the witness Burnsdale, Ayres could not be deceived by the alleged pretenses. The commission of the crime sought to be charged in the indictment was not otherwise proven than as above stated. Let us suppose the representations were made as the testimony for the

prosecution shows, yet there is nothing to show a fraudulent intent, or that Ayres was induced thereby to make the loan. The entire transaction was had within a few blocks of the court-house, where a reference to the public records would have shown the title to the lots in question. Under all the facts in the case, the only reasonable inference is that the prosecutor was trying to get out of what he considered a bad bargain.

Mr. Wharton (Wharton's Crim. Law. § 1134) says, quoting the remarks of Justice Rogers of the Supreme Court of Pennsylvania:

"The act is intended to punish a criminal offense, not to be used as a means of collecting debts, however just; and to suffer it to be perverted for that purpose will necessarily lead to great injustice and oppression. We are not without reason for believing that it has been already used as an instrument to wring money from the sympathy and fear of friends, as well as a means of extortion from the timid on pretended demands."

It is not the policy of the law to punish criminally mere private wrongs, and the statute could not regard naked· lies as false pretenses. It requires some artifice, some descriptive contrivance which will be likely to mislead a person or throw him off his guard. He may be weak and confiding. His very imbecility and credulity should receive all practical protection, but it would be inexpedient and unwise to regard every private fraud as a legal crime. It would be better for society to leave them to civil remedies.

Under the English statute (St. 22 & 23 Vict. c. 17; see, also, St. 30 & 31 Vict. c. 35), "no indictment for obtaining money or other property by false pretenses is to be presented or found by the grand jury unless the party has been committed by a magistrate." This was a safeguard against prosecutions of this character. The defendant in this case was indicted without a preliminary complaint or examination, and this we believe should also be considered. As applicable here, we will quote a part of the language of Chancellor Walworth, in *People. v. Haynes,* 14 Wend. (N. Y.) 546, 28 Am. Dec. 530:

"The construction adopted in this case is, I am persuaded, not only an incorrect, but a mischievous, construction of the statute—a construction which, if strictly maintained, would overflow our courts with criminal prosecutions, and our jails and penitentiaries with convicts. The whole Penal Code, beside, would not be half so burdensome to execute, or half so fruitful of convictions. Most of the common dealings of life might give birth to complaints before grand juries, and every exchange of property, from a ship's cargo to a barrel of flour, and even less, might afford occasion for a public prosecution. The principle that has been advanced in the opinion we are reviewing is that 'where falsehood has a material effect to induce a person to part with his property, the offense has been committed.' Apply this rule not only to the great exchanges of property, but to the innumerable and comparatively insignificant dealings of men—to every swap of horses—in fine, to every transaction by which property is transferred, a note given, or money paid—and no man could count the cases it would reach. Merchants and others in the habit of giving credits, of incurring great risks of the chance of great profits, might at first be gratified with a rule that enabled them to enforce collections by the terrors of a criminal prosecution; but when even-handed justice commands the poisoned chalice to their own lips, and they shall find themselves arraigned at the bar of criminal justice for every misrepresentation of the cost, quality, salableness, or value of every article they had sold, they too will be ready to exclaim: 'Tis rigor, and not law.'

"It can be said, I know, there will be no difficulty if men are honest and tell the truth. All will admit the obligations of truth and honesty—all have admitted them from the beginning of time —but how feeble have human laws proved in their efforts to enforce them. Does it follow, if men are not honest and will not tell the truth, they are to be arraigned and tried and convicted as felons? What scheme of criminal jurisprudence could carry out this principle? What prisons could contain the convicts? We have it from the highest authority that by nature 'all men are liars,' and a master judge of the human character has said that 'to be honest as the world goes, is to be one man picked out of ten thousand.' To punish a crime then, what the multitude of offenders make a custom is an attempt to what we can never hope to execute. It is the remark of a profound philosopher that: 'The operation of the wisest laws is imperfect and precarious. They

seldom inspire virtue. They cannot always restrain vice. Their power is insufficient to prohibit all that they condemn, nor can they always punish the actions which they prohibit.' Though the laws will not justify, yet they must recognize the frailties and imperfections of human nature, and they do deal with men as being subject to propensities and passions which they may aid to restrain, but which it is impossible to extirpate. How inconsistent would it be, when the law will not receive a man's oath, if he has sixpence at stake upon it, that it should send him to the state's prison for an untrue answer to an inquiry into his pecuniary affairs, which he may have the strongest motive for concealing. And how disturbed and uncomfortable would be the condition of a community like ours where traffic and credit are infinitely ramified and unceasingly active, if every person dissatisfied with a bargain or disappointed by a misplaced confidence, in the responsibility or punctuality of another, shall be quickened, by the prospect of redress or revenge, to recollect some untrue representation made in the course of the transaction. Stimulated by the hope of rescinding a bad bargain or of securing a doubtful debt, or irritated by the unexpected loss of what he had supposed a good one, how natural it is that he should persuade himself that 'falsehood had a material effect to induce him to part with his property,' and, prompted by an opinion which interest or irritation had created, first to threaten a criminal prosecution, and afterwards, if the terror of it proved unavailing, to sustain it by testimony always colored, and sometimes wholly composed by his passion. It is dangerous to give one man such power over the reputation and personal liberty of another. If possessed, it would be often abused, and it is inevitable that perjuries would be multiplied, and injustice and rank oppression promoted.

"I cannot concede or conceive that a construction is sound, or fitted to advance the general welfare, which proposes to protect property from loss by impositions which the owners can easily guard against and exposes reputation and liberty to invasions which no prudence or integrity may always repel. Besides, it is an Utopian idea that the sanctions of criminal justice can be made co-extensive with moral delinquencies. However agreeable to our sentiments of natural justice it might be to punish every immoral act, it would be Quixotic to attempt it. No community ever assumed the obligation of protecting by penal laws every member of it from the consequences of his own credulity, imprudence, or

folly; and, if any one should, it. would be following 'false images of good,' that could make no promise perfect. It is impossible for the public to sustain the burden of redressing every injury or loss which individual credulity or cupidity may bring upon itself. The most it can do, and what by the statute under consideration it proposes to do, is to protect individuals from these ingeniously contrived frauds and unusual artifices against which common sagacity and an ordinary experience of mankind will not afford a sufficient guard. Beyond this men must trust to their own prudence and caution, with such aids and redress as may be obtained from the civil tribunals."

In this case, we are of opinion that the evidence is wholly insufficient to establish a fraudulent intent, and the testimony, as shown by the record, is not sufficient, within the meaning of the statute, to support a conviction for the crime of obtaining money by false pretenses. Our conclusion is fortified by the fact that defendant has resided in this city for 20 years, in good repute, as shown by the record.

For the reasons heretofore stated, the judgment is reversed and remanded, with directions to the court below to dismiss the case.

FURMAN, PRESIDING JUDGE, and BAKER, JUDGE, concur.