## DOUGLAS JONES v. STATE.

No. A-3475. Opinion Filed Dec. 6, 1921.

(202 Pac. 187.)

(Syllabus.)

1. **Homicide—Burden not Shifted from State to Accused Where Self-Defense is Shown—Sufficiency of State's Evidence to Withstand Demurrer.** Where the circumstances proven on the part of the state reasonably tend to show that the accused perpetrated, or may have perpetrated, the fatal acts in self-defense, and where the homicide is admitted or proven, there is no shifting of the burden of proof from the state to the accused. Section 5902, R. L. 1910.

   (a) Under such circumstances, even though the evidence on the part of the state indicative of the guilt of the defendant may not be convincing, if there is any substantial evidence tending to prove the guilt of the accused, that question is properly for the jury, and a demurrer to the evidence, under such circumstances, is properly overruled.

2. **Witnesses—Improper Interrogation of Witnesses by Trial Judge.** It is the right of a trial judge to interrogate witnesses when essential to the administration of justice, yet the practice of so doing, except when absolutely necessary, should be discouraged. Where the questions asked by the court are such as would tend to indicate to the jury that the court is of the opinion that the defendant is guilty, or to indicate to the jury the court's belief on any material issue in the case adverse to the defendant, such procedure is clearly prejudicial to the substantial rights of the defendant.

3. **Trial—Argument of Prosecutor to Be Confined to Evidence and Conclusions Therefrom.** So long as the prosecuting attorney's argument to the jury is supported by the evidence, he may comment upon the conduct of the witnesses upon the stand and state his own conclusions drawn from the evidence. Where it is clearly within the power of the state to prove a material fact for the state, and where the state, purposely or inadvertently, fails to produce any testimony on that issue, although there is ample opportunity to do so, it is error for the prosecuting attorney to argue to the jury that such fact exists.

4. **Homicide—Decedent's Threats as Excusing Deliberation in Method of Self-Defense.** Where it is shown that on the evening preceding the fatal tragedy the deceased, without sufficient provocation, committed an aggravated assault upon the defendant with a deadly weapon and threatened to return and murder the defendant; and where the defendant knew of other facts and circumstances reasonably tending to show that the deceased would carry his threats into execution, under such circumstances

the law will not exact such calm, composed, and deliberate conduct on the part of the defendant as to cause him to pause and consider whether, as a reasonable man, he should retreat to safety or disable his assailant rather than kill him.

5.  Homicide—Self-Defense—Defendant's Immunity Not Lost Because Killing Was in Fact Unnecessary. If, under the circumstances here, the last act may seem to have been unnecessary, when considered in cold blood, the defendant would not necessarily lose his immunity if it followed close upon the others, while the heat of the conflict was on, and if the defendant believed that he was fighting for his life.

Appeal from District Court, Ottawa County; George C. Crump, Judge.

Douglas Jones was convicted of manslaughter in the first degree, and he appeals. Reversed on rehearing, remanded, and original opinion withdrawn.

Byron A. Coons, Pruiett, Sniggs, Patterson & Morris, R. McMillan, with Preston S. Davis, on rehearing, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J.  The plaintiff in error, Douglas Jones, herein referred to as the defendant, was informed against for the murder of W. H. Corder; under which information he was tried and convicted of the crime of manslaughter in the first degree, and on the 27th day of April, 1918, he was sentenced to imprisonment in the state penitentiary for a term of ten years. To reverse this judgment he prosecutes this appeal.

Defendant's counsel, at the beginning of the trial, in his opening statement to the jury, admitted the homicide, but claimed justification on the grounds of self-defense. There were nine witnesses who testified in chief for the state. Only one of this number testified as an eyewitness to the circumstances and facts of the final tragedy; two were physicians.

who testified concerning the nature and location of the wounds of the deceased; four others were officers who testified to transactions that took place the evening and night preceding the homicide; two others were persons who gave testimony concerning the conduct of defendant after the tragedy. In order to intelligently analyze the issues raised by the testimony, we give a condensed statement of the evidence in chief, in narrative form.

Grover C. Jackson testified that on and before the day of the tragedy he was employed by the defendant as a meat cutter and clerk in the grocery department of the defendant's store at Picher, Okla.; that this storeroom was on the main street, facing west, and was about 140 feet long; that the defendant lived and made his home in two side rooms, connected with the storeroom on the south; that on the morning of the homicide the deceased came into the store through the front entrance while the witness was talking to another employe by the name of Brown, near the middle of the storeroom in the grocery department; that Brown said to Corder, the deceased: "Good morning, old top! How are you this morning?" To which Corder replied: "Where is Jones? Jones is the man I want." Brown said, "Jones has gone to breakfast." Corder then went past Brown and witness and started into the Jones living room. Brown said to him, "Don't go in there." As Corder approached the door of the Jones living room Jones came out and met Corder, who at that time "had his left hand in here (indicating), working around his side, here." When they first met, Corder struck at Jones twice with his left hand and every time he would strike "he would grab back this way (indicating)." Jones then fired several shots in rapid succession; Corder staggered two or three steps and fell. "He wasn't down or wasn't up, he just crouched down like this, trying to get his gun out." "He raised up,

but didn't get clear up on his feet." Witness testified that the coat and overcoat worn by the deceased were unbuttoned, and that he knew Corder was some kind of officer, as he had seen his star.

Dr. J. Clay Williams saw the deceased just after the tragedy, while he was lying on the floor of the store. Presently the deceased was removed to the doctor's office, where the doctor made an examination. He testified as to the nature and location of the gunshot wounds and a flesh wound on the head of the deceased, and that two or three of the wounds were necessarily fatal. There was one bullet that entered the back, between the shoulder blades, ranging upward about four inches and lodging in the spinal column; one bullet entered the side of the scrotum, passing diagonally through; one bullet entered just above the left knee, breaking the leg; another bullet entered the abdomen, just to the right of the median line and near the pubic bone; another bullet entered the hip, in the heavy muscles, ranging downward. There was also a cut place three or four inches long on the scalp. The probability was that the wound in the spinal column was the direct cause of death. The doctor was not certain as to whether the deceased's overcoat was buttoned or not. The deceased had a pistol inside of his trousers, in a scabbard.

George Gibson, a deputy sheriff, testified that he had a conversation with Jones at his store a short time after the first difficulty, the evening before the homicide; that he went there in company with Deputy Sheriff Eddy, and that the purpose of these two deputies in going to the Jones store was to get Corder's pistols, which had been taken from him during the difficulty; that Jones then told the deputy sheriffs that if Corder came down there any more he would kill him. On cross-examination Gibson admitted that he and Jones had

some talk about the trouble with Corder that evening; that Mr. Eddy said to Mr. Jones, "Mr. Corder won't bother you any more; we will see that he doesn't." Deputy Gibson said that he had just talked with Corder and the latter had requested him to get his pistols; that Corder was not "drunk; he was just mad"; that later Gibson went with Corder to Miami, and that he parted with Corder at the office of Sheriff Freeman at the courthouse about 10 o'clock that night, the night before the final tragedy.

Deputy Sheriff Eddy testified that he saw the defendant, Jones, as his store, in company with Deputy Gibson, at about 8 o'clock; that he there asked Jones for Corder's pistols; and that Jones gave him one, and when he asked for the other Jones said that some one else got the other pistol; that Jones stated that he wanted the witness and Gibson to keep Corder away from there; that he had nothing against him if he would stay away from his place; that they assured him that he would not come back there that night; Jones stated that if he did come back there again he would kill him; that Corder had been there armed and drunk and that he took his pistols away from him; that Jones then seemed to be in a nervous and excited state of mind. Deputy Eddy further testified that some time after midnight he was at the Jones store again with Sheriff Freeman, where they again talked with Jones concerning the difficulty of the evening before; that during this conversation, which took place near the stove in the middle of the storeroom, there was a knock or fuss at the front door and Jones said, "There he [Corder] is now!" "After this conference we went to Justice Price's office, and I gave Corder's pistol to Sheriff Freeman and Freeman gave it back to Corder in my presence. Corder remained with me until about 3 or 4 o'clock that morning. I told him to go home and go to bed, and Corder said he would."

Justice John R. Price testified that he went to the Jones store soon after the final tragedy and placed Jones under arrest; that he asked Jones for his gun, and Jones stepped to a shelf close to the cashier's desk, reached over behind a little box, and handed him the gun; Justice Price saw the deceased at the doctor's office just before he died; that the deceased wore a dark suit of clothes and a black overcoat, and that there were two buttons on the top of his coat buttoned; that his vest was buttoned up and he was lying on his back on the stretcher.

Sheriff Freeman identified two pistols belonging to the deceased Corder. The testimony is not clear as to whether or not the pistol found on his person just after the tragedy was the same pistol that was returned to Corder by Freeman earlier that morning, as stated by Eddy.

The above, in substance, is the testimony, and all the material testimony, on the part of the state. The county attorney, in his opening statement to the jury, among other things, stated:

"It will appear to you, gentlemen of the jury, in evidence that on the day or evening prior to the killing that Mr. Corder had some official business in that store; that he went there and that some little difficulty occurred then between he and Mr. Jones, the defendant; that the next morning Mr. Corder again went to this store and that then the tragedy occurred."

It will be seen from the abstract of the testimony given above that there was no testimony on the part of the state whatever indicating that Corder went to the Jones store on official business, and no showing whatever that he had any legitimate private business there of any kind or character. The testimony on the part of the state shows no motive or reason why the deceased went to the defendant's premises in

the first instance. There is a reasonable inference deduced from this testimony that the deceased went to the Jones premises without cause and provoked the difficulty; that he was there disarmed of his pistols; and that he returned the next morning with the purpose of renewing the quarrel, and that the defendant may have been justified in doing what he did in his necessary self-defense.

Where the homicide is admitted and proven, as in this case, there is no shifting of the burden of proof, where the circumstances proven on the part of the state reasonably tend to show that the fatal acts may have been done in self-defense. Section 5902, R. L. 1910, is as follows:

"Upon a trial for murder, the commission of the homicide of the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." Fitzsimmons v. State, 14 Okla. Cr. 91, 166 Pac. 456; Culpepper v. State, 4 Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1176, 140 Am. St. Rep. 668, notes and cases there cited; Taylor v. Territory, 2 Okla. Cr. 1, 99 Pac. 628.

Keeping in mind the statute above quoted and the construction placed upon it by this court, where, as in this case, the state's testimony in chief tends to show that the accused was justified, or may have been justified, in taking the life of his assailant, the burden of proof does not shift to the accused. The evidence on the part of the state, on any theory indicative of the guilt of the defendant, was unsatisfactory; but where there is any evidence tending to prove guilt that question is properly for the jury, and the demurrer to the evidence in this case was properly overruled. Taylor v. Territory, 2 Okla. Cr. 1, 99 Pac. 628.

After the overruling of the motion for an instructed verdict the defendant introduced numerous witnesses, whose testimony tended to show that the deceased and the defendant were strangers; that the defendant was a man about 60 years of age, residing with his wife and daughter in two rooms connected with his store; that on the evening before the final tragedy the deceased, in a drunken condition, in company with a woman by the name of Ida Smith, came to the defendant's home and place of business adjacent and called the defendant out into the alley at the rear of the premises, where, without apparent reason or cause, he assaulted the defendant with two pistols which he thrust muzzle forward, against the body of the defendant; that the two there grappled and scuffled for the possession of these two guns and so passed into the rear of the store, where the defendant finally got possession of one of the pistols and a bystander forcibly procured the other; that while this difficulty was going on, and immediately afterwards, the deceased threatened to kill the defendant. The testimony of Mr. Brown, an employe of the defendant, and of another who forcibly conducted the deceased away from the premises, was to the effect that the deceased threatened to return and kill the defendant, and that Brown had communicated these threats to the defendant prior to the final and fatal tragedy, which occurred on the morning following.

The defendant testified that he remained awake all that night in anticipation and fear of a second assault by the deceased, and that he spent the night sitting and walking near the stove in the storeroom, near the entrance to his living rooms, where his wife and daughter were, and that Brown remained with him there during the latter part of the night; that on two different occasions that night he had a conference with Sheriff Freeman and Deputies Eddy and Gibson, to whom he related the circumstances of the assault upon him

that evening; that upon their request he gave one of the guns taken from the deceased to Deputy Eddy, and that the other gun had previously been given to Ida Smith, who claimed that it belonged to her; that all of these officers assured the defendant that they would see that Mr. Corder did not return; that after receiving such assurances Corder did return about or shortly after midnight, and tried to get into the store. Fearing to remain alone, defendant then called Brown from the latter's sleeping room at the rear of the store, to remain and watch with him the remainder of the night. The next morning at about 7 o'clock the defendant went into one of his living rooms, while Brown and Jackson were cleaning up and arranging stock for the day's business, when Corder came in at the front door of the store and said to Brown: "Where is Jones? Jones is the man I want." Corder proceeded towards the door of Jones' living room when Brown requested him not to enter and at that instant Jones came through the door and the two met and the fight began, and the shooting occurred substantially as stated by state's witness Jackson, as before related, except that there was additional evidence tending to show that after the shooting ceased, while the deceased was making a further effort to get his gun and was partially prostrate, endeavoring to get up onto his feet, the defendant struck the deceased on the head with his pistol.

There is conflicting testimony to the effect that while deceased was lying on the floor, mortally wounded, defendant tried to prevent several bystanders from giving Corder water or removing him from the premises; that he made remarks indicating that he was in a wicked and malicious frame of mind towards the deceased.

The defendant's testimony disclosed nothing tending to explain the presence of the deceased at the defendant's premises the preceding evening, or why he made the assault

upon the defendant. The county attorney, in his opening statement to the jury, said that the deceased went to the defendant's premises on official business, and the court, by innuendo, indicated that he might have been there to enforce the prohibitory law. On this point there is nothing amounting to the dignity of evidence. What was said by the county attorney and the court were mere matters of speculation, which the defendant claims amounted to prejudicial error, of which more will be said later. The defendant and several disinterested witnesses testified that the deceased was intoxicated the evening before, as well as the morning of, the tragedy.

Upon the question of whether the deceased, as a deputy sheriff, was lawfully at the premises of the defendant on both or either occasion, the only evidence in the record is to the effect that he was there unlawfully and entitled to no other privilege than a private citizen would have under the same circumstances. Section 2548, R. L. 1910, is as follows:

"Public officers while in the discharge of their duties or while going from their homes to their place of duty or returning therefrom shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, that if any public officer be found carrying any such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person."

Numerous assignments of error are urged as grounds to reverse this judgment. For sake of brevity we will analyze but three, those most insistently urged, which, in our opinion, are decisive of this case. These may be stated, in substance, as follows: (1) That the trial court erred in propounding questions to the witnesses, indicating to the jury, by innuendo, the court's notion of the credibility of the witnesses, the motives of the defendant in connection with the assault, and

by inference suggesting that the deceased got into this difficulty while in the discharge of his official duties; (2) misconduct of the county attorney and of the special prosecuting attorney, employed by private persons, in commenting on assumed facts not shown in the evidence; (3) that the verdict is not supported by sufficient evidence to warrant conviction.

It has been pointed out in the brief of the defendant that during the examination of witnesses the court, on many occasions, interrupted counsel and propounded questions to the witnesses from the bench. During the course of the examination of witness Brown for the defendant, at pages 177 and 178 of the record, the following appears:

"The Court: Mr. Brown, is there a chat pile out there, close to Mr. Jones' store?

"Witness: What do you mean, one of those mills out there?

"The Court: Do you know what a chat pile is?

"Witness: Yes, sir; back in the back alley.

"The Court: Were you out at that chat pile just before you went in Mr. Jones' store?

"Witness: No, sir.

"The Court: Were you at that chat pile and saw Mr. Corder and he followed you in that store?

"Witness: No, sir; I was not.

"Mr. Pruiett: What time, your honor?

"The Court: Just before the difficulty occurred the first time.

"Mr. Pruiett: The evening before?

"Witness: There is a little chat pile out there.

"The Court: When Mr. Corder came into the store, did he say to Mr. Jones that you had been out at that chat pile and you got some whisky and he wanted it?

"Witness: No, sir.

"The Court: And halloaed for help and he didn't take it away from you?

"Witness: No, sir; nothing of that sort ever happened.

"Mr. Pruiett: We want to object to the court propounding these questions unless the court has—is armed with testimony that such a thing as that happened.

"The Court: Objection sustained.

"Mr. Pruiett: And ask the court to instruct the jury not to consider these questions.

"The Court: You will not consider these questions."

After the court had so examined the witness, the county attorney, Mr. Turner, followed it up with the following examination:

"Q. Didn't you hear on that occasion when you said he came in Monday evening, didn't Mr. Corder state, 'I came in here after that man that brought that whisky in here'? A. No, sir; I never heard of whisky being in the house in my life.

"Q. Didn't Mr. Jones say, 'There is no whisky in here'? A. No, sir; I never heard of whisky being in that house before. Never did. It's something I don't use. I never used half a pint of whisky in my life."

In the course of the examination of Mr. Ayers, a witness for the defendant, at page 188, appears the following:

"Q. Now, were you present there when they took Mr. Corder down to the police station? A. I was.

"Q. Did you hear anything said by Mr. Corder? A. Why, he was still swearing that he would kill him, and cussing. He was drunk.

"Q. He was drunk? A. Yes, sir.

"Mr. Pruiett: Take the witness.

"The Court: Just a minute. What time of day was this?

"Witness: Well, I would judge—it was after dark; 8:30, perhaps.

"The Court: What kind of lights were there in there?

"Witness: In the house?

"The Court: Yes, sir.

"Witness: I believe gas lights.

"The Court: How far were you from the door?

"Witness: I judge about 30 feet, just out of the light of the door.

"The Court: How could you see out of doors?

"Witness: Could I see out of doors—I could see in the darkness.

"The Court: There was no light out of doors?

"Witness: No, sir.

"The Court: Dark out there except the light from the room?

"Witness: Yes, sir.

"The Court: Where was Mr. Corder the first time you saw him?

"Witness: Mr. Corder was coming out of the door and Mr. Jones right next to him?

"The Court: Well, now, did he hold him up in the house or out of doors?

"Witness: I couldn't say, I heard some disturbance—

"The Court: Well, now, did he hold him up in the house or out of doors?

"Witness: The first time I saw the guns Mr. Corder turned around—

"The Court: I asked, did he have the pistols on him in the house or out of doors?

"Witness: Out doors.

"The Court: How far from the door?

"Witness: Well, very close to it. I couldn't say the number of feet. I judge four or five feet from the doorway."

Again on page 198, the court interrogated as follows:

"The Court: Mr. Stevens, did you see the first of that trouble?

"Witness, No, sir.

"The Court: Was there any explanation made by Mr. Corder or by Mr. Jones why Mr. Corder was there? A. No, sir; not that I heard.

"The Court: What was the appearance of Mr. Corder as to being mad, or otherwise, after they took his guns away from him?

"Witness: He acted like he was mad.

"The Court: What about?

"Witness: I don't know what about.

"The Court: Just what did he say?

"Witness: Just what I said, Judge.

"The Court: Did he say anything else?

"Witness: Never heard him say anything else.

"The Court: Did he say anything about being an officer and taking his guns away from him?

"Witness: No, sir."

Mr. Matthews, a witness for the defendant, had testified that on the morning of the final tragedy he had been to the

premises of Ida Smith for the purpose of purchasing whisky and that Corder was there. After this testimony had been given, on page 236 appears the following:

"By the Court: What time of morning was this that these threats were made?

"Witness: Somewhere near 7 o'clock.

"The Court: What kind of a house does Ida Smith run?

"Witness: I couldn't say what kind of a house she runs.

"The Court: What?

"Witness: I don't know; she was running a rooming house.

"The Court: Were you boarding there?

"Witness: No; I was in there after whisky.

"The Court: You went in there after whisky?

"Witness: Yes, sir.

"The Court: Had you been to breakfast?

"Witness: No, sir."

And later, on page 234, the court again interrogated the witness as follows:

"The Court: Did Mr. Corder see you buy this whisky?

"Witness: Yes, sir.

"The Court: Stand right there and watched you buy a pint of whisky from this woman? A. Yes, sir."

Another instance appears at page 244 of the record:

"The Court: Mr. Lunsford, did you know that he was a deputy sheriff?

"Witness: I knew he was some kind of an officer: I seen he had a gun and a star.

"The Court: Did you report his conduct to the sheriff?

"Witness: No, sir.

"The Court: Did you report the sale of that whisky you bought?

"Witness: Did I what?

"The Court: Did you report the sale of that whisky you purchased to the sheriff?

"Witness: No, sir.

"The Court: Did you go down and tell Mr. Jones that there was a drunken officer up there threatening to kill him?

"Witness: No, sir.

"The Court: You took no interest in it whatever?"

Again, at page 265, appears the following:

"The Court: Did you or have you learned since what reason he had for being there that night, Mr. Jones?

"Witness: If your honor please, I have heard.

"The Court: Did Mr. Freeman tell you?

"Witness: No, sir; Mr. Freeman never told me anything."

At a number of other times, not mentioned above, the court interrogated the witnesses. From the repeated efforts of the court to elicit testimony from the different witnesses to the effect that whisky was or might have been dispensed at or near the Jones premises, and that Corder came to the premises in his official capacity to enforce the prohibitory law, the jury would naturally believe, from the repeated interrogations by the court on this subject, that such indeed was the fact, although there is no competent testimony whatever supporting this conclusion.

It is the right of a trial judge to interrogate witnesses when essential to the administration of justice, but the practice of so doing, except when absolutely necessary, should be discouraged. When the questions asked by the court are

of such a character as would tend to indicate to the jury that the court is of the opinion that the defendant is guilty, or to indicate to the jury the court's belief on any material issue in the case adverse to the defendant, such procedure is clearly prejudicial to the substantial rights of the defendant. In the case of Harrison v. State, 11 Okla. Cr. 14, 141 Pac. 236, it was held that the examination of the defendant by the court after the county attorney had closed his cross-examination, as quoted below, was prejudicial error:

"By the Court: Q. This woman had gotten on the train going west, and she pecked on the window and picked you out to have a good time, and you took her to Swain's park; she gave you $2 to buy beer with; you had no trouble you stated; you still had her $2; she was standing there and you told her you were coming back; you were going to see this cabman and see about the beer; how do you account for the fact that she had you arrested and charged with this crime? What explanation do you make of that to the jury? A. I couldn't tell what her motive was in the matter.

"Q. Why do you think she would go to work and charge you with this crime? A. I don't know what she should do that for. She would have no cause to do anything like that; we had no words or falling out in the meantime."

In the opinion of this court, the instances of the court's examination complained of in the instant case were more flagrant and damaging than in the Harrison Case. The prejudicial effect of this error was aggravated by the remarks of the county attorney in his opening statement, to the effect that Corder went to the Jones premises on official business, and by the argument of the special prosecuting attorney in his closing argument to the jury. Under the circumstances here the state could have shown the fact, if it were a fact, that Corder did go to the Jones premises on official business. No such showing was made, as promised by the county attorney in his opening statement, and none appears in evidence. The special prosecuting attorney, in his closing argument, said:

" * * * In this state a man—an officer—can arrest a man for a misdemeanor when he is in the commission of an act, or arrest a man for a felony without a warrant. * * * I believe as I stand here and as I challenged them to open the case and let it be shown he was there in an official capacity the first time; there the first time in his official capacity—

"Mr. Pruiett: We object to that argument: highly improper for the reason there is no testimony in the record to justify counsel's statement that he believes he was there in an official capacity.

"The Court: Objection overruled.

"Mr. Pruiett: I will ask the court to instruct the jury not to consider it.

"The Court: Overruled.

"Mr. Pruiett: Exception."

So long as counsel confines his argument to the evidence produced or admitted at the trial, he may arraign the conduct of the parties, attack the credibility of the witnesses, comment upon the appearance of the witnesses, and their conduct upon the stand, and state his conclusions drawn from the evidence. So long as his argument is supported by the evidence, the most liberal freedom of speech may be allowed; but where it is clearly within the power of the state to prove a material fact, and the state utterly fails to produce any testimony on that issue, although there is ample opportunity to do so, it is error for a prosecuting attorney to argue to the jury that such fact exists.

Considering all the testimony in this case together, the jury could not have convicted the defendant of manslaughter except upon the theory that the defendant went further than he was justified in doing in his necessary self-defense. A drunken peace officer armed with pistols is a dangerous combination, more liable to commit a breach of peace than to keep the peace, yet, no matter how great the provocation, the de-

fendant had no right to take life except in his necessary self-defense; yet all these facts should be considered as tending to show the state of mind of the defendant and his fear of death or great bodily harm at the time of the final tragedy, viewed from his standpoint. After the aggravated assault upon him of the night previous and his all-night vigil in anticipation of a renewed attack, the defendant was probably not in such a composed state of mind as to pause and consider whether, as a reasonable man, he should retreat to safety or disable his assailant rather than kill him. Under such circumstances the law will not exact such calm and deliberate conduct. The Supreme Court of the United States, speaking through Mr. Justice Holmes, in Brown v. U. S., 255 U. S.—, 41 Sup. Ct. 501, 65 L. Ed. —, decided May 16, 1921, said:

"Moreover if the last shot was intentional and may seem to have been unnecessary when considered in cold blood, the defendant would not necessarily lose his immunity if it followed close upon the others while the heat of the conflict was on, and if the defendant believed he was fighting for his life."

We think the testimony, as a whole, is insufficient to support the verdict.

This cause is therefore reversed and remanded for further proceedings not in conflict with this opinion. If there is no further evidence available supporting the state's case, the cause should be dismissed.

DOYLE, P. J., and MATSON, J., concur.