CARL GRAHAM v. STATE.

No. A-4135.     Opinion Filed Dec. 17, 1923.
(220 Pac. 967.)

(Syllabus.)

1.    **Appeal and Error—Exclusion of Evidence of Fact Otherwise Proved not Prejudicial.** The exclusion of evidence to prove particular facts is not prejudicial if the facts sought to be proved are proved by other evidence and it appears that the evidence excluded should not have changed the result.

2. **Homicide—Assault with Intent to Kill—Exclusion of Evidence of Threats Against Accused not Prejudicial Where Hostility Otherwise Proved.** The exclusion of evidence of alleged threats, where evidence of other threats was admitted to be introduced as having been made by the prosecuting witness against the defendant and it was conceded that on the day of the shooting the prosecuting witness and the defendant had had a quarrel which resulted in both of them being arrested, disclosing that ill feeling existed between the parties at the time of the shooting, is held not to be prejudicial error.

3. **Homicide—Self-Defense—Reasons of Accused for not Living with Wife Irrelevant.** In a prosecution against defendant for shooting his wife's stepfather, where the issue of self-defense is raised, an investigation into the reasons of the defendant for not living with his wife were not germane to the issue of self-defense, and such evidence was properly excluded.

4. **Instruction Approved.** Instructions bearing on the issue of self-defense examined in connection with other instructions given and refused, and it is held, that the instructions given fairly and fully cover the law of the case and that no prejudicial error occurred in refusing to give instructions requested.

Appeal from District Court, Muskogee County; Benjamin B. Wheeler, Judge.

Carl Graham was convicted of assault with intent to kill, and he appeals. Affirmed.

On the 12th day of April, 1921, the county attorney of Muskogee county filed in the district court of said county an information charging the plaintiff in error, Carl Graham (hereinafter referred to as defendant), with the crime of assault with intent to kill one John Cash, alleged to have been committed on the 17th day of February, 1921, in Muskogee county.

On the 24th day of May, defendant having waived arraignment and pleaded not guilty to the charge, the cause came on regularly for trial before the Hon. Benjamin B. Wheeler, district judge, and a jury.

On the 25th day of May, 1921, after having heard the evidence and the instructions of the court, the jury returned a verdict of guilty as charged in the information and fixed the punishment at imprisonment in the peniteniary for a term of four years. On the 27th day of May, 1921, the defendant filed his motion for a new trial, setting out 21 different grounds and reasons for a new trial, and on the 6th day of June, 1921, the motion for a new trial was heard and overruled; whereupon the trial court proceeded to sentence the defendant, on the verdict returned, to four years' imprisonment in the state reformatory, to all of which actions the defendant excepted and prayed an appeal to this court. After proper allowances of time to make and serve case-made, due notices of appeal having been given, the trial judge, on the 30th day of July, 1921, certified to a true and correct case-made, and the same, with petition in error attached, was filed in this court on November 26, 1921, and the appeal is regularly before this court for review on its merits.

John Cash, the prosecuting witness, at the time he was shot by the defendant worked in the grocery store of E. L. Powers, which store was located at 107 North Main street in the city of Muskogee, Okla. Cash was the stepfather of the wife of defendant Graham. It appears that some time early in the fall of 1920, Graham had been compelled to marry the stepdaughter of Cash in order to avoid a prosecution for rape or some other similar felony.

On the morning of the 17th of February, 1921, Cash had called Graham out of the A. & C. Pool Hall, which is located on West Okmulgee street between Second and Main streets in the city of Muskogee, and walked with the defendant to the corner of Main and West Okmulgee streets. There a controversy occurred between Cash and the de-

fendant concerning the wife and baby of the defendant, in which conversation Cash said that he asked defendant if he said that the baby did not belong to him, and defendant said he did not say it, "and you cannot prove it," and Cash told him that he could, that defendant's wife had told him, and if she said that in front of defendant's face and his face he told defendant he (Cash) was going to make defendant swallow every word he said about it; that the defendant got sore, and at that time a policeman, George Sherrod, walked up and arrested them and took them down to the police station.

Concerning the trouble that day at Main and West Okmulgee, the defendant testified as follows:

"We walked down to the corner of Main street, and he said he heard— My wife told him that I said the child didn't belong to me, and he said he was going to kill me if I denied it. I told him, I said, 'Why don't you do it?' And then Mr. Sherrod arrested us."

Further the defendant testified that while they were on their way to the jail, after Sherrod had arrested them, Cash said, "I will get you before night," and Sherrod turned around and told him to shut up—"I wouldn't make those threats if I was you."

That after this occurrence at Main and Okmulgee, and after the arrest of these parties, they each put up money for their appearance in the police court in that city for disturbing the peace, and Cash went back to work at the grocery store and Graham went to a secondhand store and purchased a Remington 32 automatic pistol, loaded.

The shooting occurred about 3 o'clock that afternoon in front of Power's grocery store. The defendant shot Cash with the 32 pistol that he had bought that day from the sec-

ondhand dealer. Cash was unarmed at the time, was dressed in his work clothes, and wearing a long rain coat.

Just what occurred immediately preceding and at the time of the shooting is detailed by Cash as follows: After having testified that he left Powers' grocery store about 3:10 that afternoon to make a special delivery of an order of groceries, and when leaving the store he saw this defendant and another fellow standing in front of the Stag cold drink stand which adjoins the grocery store on the north, both stores being on the west side of Main street, that he made the delivery, was gone about 7 or 10 minutes, and came back, and the defendant was still standing there when he came up to the curbing and parked his car and reached down to cut off the engine, then he said the following occurred:

"Q. What do you mean by cutting your engine off? A. Cut the motor off—stop it from running. Q. I see. A. And just as I raised up he was standing in front of me, and he shot just as I looked. Q. Were you in the car at that time? A. Yes, sir. Q. Did you ever get out of the car? A. Never did. Q. What did you do when he fired first? A. Well, I kind of staggered and fell back in the seat. Q. Where did he hit you the first shot, if you recall? A. The first shot he hit me, he hit me just about an inch above my heart. Q. Stand up, if you will, John. How many times did he shoot at you? A. He shot at me eight times. Q. How many times did he hit you? A. He hit me eight times. Q. How close was he standing to you when he fired the first shot? A. About six feet from me. Q. Did he move from that place during the time he was firing? A. He made two or three shots and stopped to get up closer to me and he fired the rest. Q. What were you doing—before I get to that, now just tell the court and jury where you were shot, the different places you were shot. A. Well, I was shot through my chest here once—shot in my arm. Q. Now, just tell which arm. A. In my right arm, right in my elbow, and broke it, and then the next shot —I don't know which shot—I was shot through this leg once.

Q. Which leg is that? A. My left leg. Q. And where would you say this shot entered? A. It entered just about here and came out here (indicating). Q. How far above your knee? A. Well, I don't know; just about nine inches, I guess. Q. Entered in the front? A. Yes, sir. Q. And came out at the rear of the leg? A. Yes, sir. Q. Tell the next place. A. Well, the next shot is through my foot here, through the bottom of my foot. Q. Which foot? A. Left foot. And the next shot was a glancing shot up this way. Q. On which side? A. On my left side. Q. On the top of the thigh of the leg? A. Yes, sir; and the next shot—this was a glancing shot across this leg. Q. Glancing what part of the leg? A. My left leg. Q. In front? A. Yes, sir; and the next shot went through this right leg and came through here inside. Q. Where did it enter in the left leg, near what? A. Right close to my knee. Q. And came out? A. Came out right here, right along here. Q. About 9 or 10 inches above the knee? A. Yes, sir. The next shot went through here somewhere in my hip. Q. Through your right hip? A. Yes, sir. Q. Just through the flesh? A. Yes, sir. Q. Is that all? A. Yes, sir; that is all. Q. Sit down now. Now, I will ask you, John, to explain to the court and jury the rapidity of the shots, how fast the shots were fired? A. Well, they was shot so fast I don't know how far apart they were fired; I know every time he hit me. Q. You mentioned a moment ago he shot two or three times and then he stepped up? A. That is when he shot the first three or four shots. I don't know exactly how many shots he fired when he stopped and got up closer to me. Q. Then how rapidly did he fire the rest of the shots? A. Yes, sir; pretty fast. Q. What did you say, if anything? A. Well, I could not say. Q. Did he say anything? A. No, sir; he never said a word. Q. Did you notice what sort of a gun it was he was using? A. Well, I think it was an automatic. Q. You don't know whether it was or not? A. No, sir. Q. And you described these shots, were attempting to describe the shots, as they were fired into your body, or just the place where you were hit—do you understand my question? A. Yes, sir. Q. When you just described the shots, the places you were shot in the body, as you de-

scribed them, was that the way you were hit, or were those just the places where you were hit? A. That is where I was hit. Q. Did you attempt to describe the first, second, and third places, and so forth? A. No, sir; I didn't. Q. Can you do that? A. Well, I don't believe I can. Q. You can't tell where the first shot hit you? A. Yes, sir. Q. Do you know where the last shot hit you? A. No, sir; I don't Q. What were you doing while this shooting was going on John? A. Well, I wasn't doing anything but jumping and hollering, 'Murder!' Q. While you were doing that, where were you in the car? A. Yes, sir; I had done fell back in the body of the car. Q. Now, I want you to describe to the jury this seat you were sitting on, on the Ford truck you speak of. Did it have a back or not? A. Well, the place where the steering wheel is has got a back on it. Q. Which side is the steering wheel on? A. On the left-hand side. Q. Go ahead and describe the back of the seat. A. That is just a little piece about this long on the left-hand side of the steering wheel, and the other part there ain't nothing to it, and when I got up to get off the car he made the first shot, and I fell back to the seat something like this, like I was sitting down, and he kept firing, and finally I fell back into the body. The body came along up about this far up. Q. About a foot or so, you say? A. Yes, sir; and my legs was on the seat and my body was down in the body. Q. Where were your legs with reference to the rest of your body and the defendant Carl Graham, while he was doing that shooting, between you and Carl Graham or the other way? A. Between him. Q. And your head? A. And my head, yes, sir. Q. Did you see —I don't know whether I asked you or not—did you ever get out of that car? A. No, sir; until they taken me out when I got to the hospital. Q. Did they take you to the hospital, did you know, at that time? A. At that time, I didn't know; no, sir."

The defendant's version of the tragedy was detailed by him as follows:

"A. Yes, sir; and I was fixing to go down to my room, and I went to one of these secondhand stores to buy an auto-

matic. When I first went in, one of those fellows was busy, and I went out on the street, and I went back and bought this gun. Q. What made you buy that gun? A. Well, he had been threatening to kill me, and I bought it for protection. Q. Had other people told you about threats he had made? A. Yes, sir. Q. And you bought that for what purpose? A. To protect myself with. Q. Did you have any intention of assaulting or hurting him in any way or making any effort to hurt him, unless he first assaulted or attacked you? A. No, sir. Q. Now, who was with you at the time of and just before the shooting? A. Henry Cowan. Q. Henry Cowan? A. Yes, sir. Q. Is that the Henry Cowan that testified this morning? A. Yes, sir. Q. Where did you get with Henry Cowan? A. On Broadway. Q. Where did you go when you got with Henry Cowan or he got with you? A. Well, he was going to work, I suppose, or going down to the A. & C. Pool Hall, I think, and I was going to my room. Q. Was you on the direct route to your room? A. Yes, sir. Q. Were you at any time standing in the stairway there as testified to by Cash? A. No, sir; I was not. Q. At the time of the trouble had you come straight from where you got with Henry at the time the shooting; had you come straight down there, from where you got with Henry Cowan? A. Yes, sir. Q. Now, I want you to tell the jury, Carl, just what happened when you came along there where the trouble occurred? A. Well, I was going down the street, and Henry Cowan came along—I knew Henry, and stopped, and we started on down the street, and just about the time I got pretty near even with this grocery store, I didn't lack much, nearly even with it, he whips into this curb with his car and jumps out, gets out of the car, and said, 'I am going to kill you, you son of a bitch,' and throwed his hand back that way (designating), and I seen the handle end of a gun, and when he done that, I shot him; I shot him, I don't know, maybe three or four times, and he gets back in the car, and I thought he was going to stop, and I slowed up for a second or two, I guess it was; he acts—he had a rain coat on, and he acts like he is getting behind something, so I shot him again. I don't know just how many

times I shot him. I shot him a time or two. I shot him until he fell. Q. When he got in the car now, you say you slowed up. Why did you slow up? A. I thought he was going to stop. Q. And that is what made you begin shooting again, when he acted like he was getting behind? A. For protection, to protect myself. Q. Did you think he was going to shoot you? A. Yes, sir.''

Dr. W. T. Tilly, who waited on the prosecuting witness immediately after the shooting, described the wounds as follows:

''A. Well, there was one entered just at the elbow here, and ranged up, splitting this bone in three pieces, and that bullet is still in there, I suppose; it was the last I knew. And then there was another one just above the heart and through, and there was another one went in here and came out back there. Q. When you say 'in here,' Doctor, please designate the leg or arm so we can get it in the record? A. Well, there was one went in, my recollection is, along about the middle of the thigh, between the knee and hip. Q. That left leg? A. Of the left leg, and came out just about that angle; and then there was one went in—either went in there or came out there, I don't know which, but right in there, and came out at the toes here. Q. Of the left foot? A. Of the left foot. Q. About the center of the left? A. Center of the left foot, and came out at the toes. And then there was another one went in about six inches above the knee. Q. In the right leg? A. Yes, and came out about six inches from the hip joint, under the thigh, and then there was two glancing shots, I believe it was, that is my recollection, on the left side of the hip; one here and one a little higher up. One grazed the side just above the hip, is my recollection.''

Hugh Askew, a witness for the state, testified in substance that he was across the street and probably a little north from where the shooting occurred, in the Cardinal Wholesale Drug Company's place; that he heard one or two shots, walked to the door several feet, and saw the defendant

fire five or six times; that John Cash was lying in a Ford delivery truck; that after the shooting he went over to the car; that there were several persons around, but he did not know who reached Cash first; that Dr. Tilly's son and some one else got into the truck and drove Cash to the hospital; that the shooting had ceased before he started over to the car.

Frank Fabian testified, in substance, that he was on the corner of Main and Okmulgee streets when the shooting began; that he did not see the first two shots, guessed he saw about the third; that what he thought was the third shot fired Cash was in the car sitting in the seat; that he thought he saw four shots fired; that they came so fast he did not get to count them; that he ran up there, and before he got there the firing had ceased; that Graham was 8 or 10 feet from Cash at the time of the shooting.

On cross-examination, this witness stated that Graham was standing west of Cash when the shooting was going on, and that Cash was sitting in the seat; that Cash was sitting up straight and dodging.

Sam Hutchinson, a negro, testified in substance as follows: That he had just come out of the store, when two men came along, and that he saw the shooting; that just as he came out of the store a fellow drove up in his automobile, and that one of the two men began shooting him; that the man who was getting shot did not get out of the car, but fell to the floor and began hollering; that it seemed to him the fellow doing the shooting shot four or five times.

Ed Davidson testified in substance that he was working as a merchant police; that he saw the last two shots fired; that he was across the street and went over and arrested the defendant; that the defendant was standing on the sidewalk

in front of the Powers Grocery Store; that Cash was in the automobile when the last two shots were fired; that he found the gun in the defendant's hip pocket; that the defendant made no resistance when he was arrested.

Henry Cowan testified on behalf of the defendant, and said in substance that he saw the trouble that occurred between the defendant and John Cash; that it occurred on Main street between Okmulgee and Broadway; that he and the defendant were walking along the sidewalk, having come from Main street and Broadway; that they were going south; that they were at no time in the stairway between the place called the Stag and Powers Grocery Store; that he and the defendant were walking along when Cash drove up in a Ford car to the curb, jumped out on the sidewalk, and said, "I am going to kill you," and reached back in his hip pocket, and that the defendant began shooting; that he could not tell whether Cash had a pistol; that he (witness), when the shooting began, stepped back close to the stairway; that Cash jumped back in the seat of the car and kept dodging around, it looked like, to get behind the seat. This witness further testified that the defendant had said or done nothing to or toward John Cash until Cash had done what the witness stated he had done, as above set out.

On cross-examination, this witness stated that he worked at the A. & C. Buffet & Pool Hall, 105 West Okmulgee; that he had known the defendant 12 or 14 years; that he had never discussed this case with the defendant, but had with his lawyers.

J. F. Rice was next called, and testified in substance that the day after the defendant married John Cash's stepdaughter he heard Cash talking on North Third street; that Cash asked him (the witness) where the defendant was; that

he told Cash he had seen the defendant around the corner just awhile ago, about 30 minutes ago, and Cash said: "Well, I am looking for him; if I find him it won't be very healthy for him." And he put his hand back like this, back on his hip; that he told the defendant what Cash had said to him before the trouble; that the statement made by Cash to him was last fall some time, and the next day after the defendant married the stepdaughter of John Cash.

J. H. Miller was next called on behalf of the defendant, and testified in substance that he knew both the defendant and John Cash; that he saw the trouble that occurred between them; that he saw Cash drive up and that Graham was going down the street with some one whom he did not know; that Cash jumped out of the car and pulled his coat back like this, and started toward Graham; that just as he did that he (witness) saw a flash; that Cash said something, but that he did not understand it; that after Graham began shooting, Cash was jumping around and got back in the car and got in the seat.

C. O. Millsaps was next called on behalf of the defendant. He stated in substance that he resides at 3210 Denver, Muskogee; that he had lived in Muskogee 11 years; that he was a stepbrother of the defendant; that he was present at the difficulty between the defendant and John Cash in front of the Powers Grocery Store; that Cash drove up in a Ford car, and got out and called the defendant a son of a bitch and put his hand back like this, like he was going after his gun; that about that time the defendant went to shooting; that Cash got out of the car and stepped upon the sidewalk and reached back, and that he (witness) saw the handle of a pistol; that he was probably 15 or 20 feet away; that Henry Cowan was walking with defendant just before the shooting occurred; that they came from the north and were going

south; that he did not know how many times the defendant shot; that after defendant began shooting Cash jumped back in the car; that he thought the defendant fired about twice after Cash got in the car; that the defendant did not say or do anything to Cash until Cash did as above related; that Cash did not get the gun out of his pocket; that he did not see the defendant until after Cash had made some remark and had his hand on his gun; that after he saw Cash with his hand on his gun he looked around and saw the defendant with his gun.

Bob Harris was next called on behalf of the defendant, and testified that he was coming down the sidewalk; that the defendant and another party were behind him; that he went into the Stag cold drink stand, and just in an instant he heard the shooting; that just as he went in he saw Cash drive up in the delivery car and stop and get out; that he then stepped into the cold drink stand and almost immediately the shooting took place; that Cash parked his car in front of the grocery store.

The defendant as a witness in his own behalf, in addition to what has heretofore been stated, testified that after he had shot Cash three or four times he thought Cash was going to stop, and that he (defendant) slowed up for a second or two; that Cash had a rain coat on and acted like he was going to get behind something, and that he (defendant) shot him again and shot him until he fell; that he believed Cash was going to shoot him; that if he had not thought so he would not have shot Cash; that he did not shoot any after Cash fell to the floor of the car; that he had heard of threats Cash had made against him.

On rebuttal the state introduced evidence as follows:

"James Oliver Tilly testified in substance that he appeared on the scene two or three minutes after the shooting; that John Cash was in the back of a Ford delivery truck; that when he came up a bunch of men were around there; that they were all excited; that he came within about 2½ feet of Cash; that he got in the Ford truck after a little while and took Cash to the hospital; that Sig Hargrove went with witness to the hospital; that when they got to the hospital Cash's clothing were cut off and laid aside; that Mrs. Rogers made a search and found no gun or weapon of any kind; that he (witness) saw no gun in the car.

"On cross-examination the witness said he did not know who was the first person to Cash, or what they did.

"W. S. Spessard was next called, and stated in substance that he saw the defendant and Henry Cowan in front of the Stag about 10 minutes before he heard the shooting.

"J. W. Beheler was next introduced, and stated in substance that he was 10 feet away when the last two shots were fired; that when the shooting ceased he went to the truck and laid Cash down in the truck; that he saw no pistol."

The above and foregoing is in substance the evidence introduced in the case.

Crump, White & Seawel, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). It is first contended that the trial court erred in excluding certain evidence offered in connection with the examination of the witnesses Rice and Reed and the defendant, which said evidence related to certain threats alleged to have been made by the prosecuting witness, John Cash, against the defendant Graham.

The portions of the record necessary to be considered in connection with this assignment of error are as follows:

"Q. State your name. A. W. E. Reed. Q. Where do you live, Mr. Reed? A. I live out at Brushy Mountain now. Q. Were you sworn with the other witnesses yesterday? A. Yes, sir. Q. Are you acquainted with Carl Graham, the defendant? A. Yes, sir. Q. Do you know John Cash? A. I know him when I see him. Q. Have you ever heard John Cash say anything about Carl Graham in any way? A. I heard him—

"By Mr. Gumm: I object unless he knows. A. Yes.

"By Mr. Crump: Q. When was it about, as near as you can tell? A. Last summer sometime; I believe it was last summer, as near as I can remember, right after Carl got into trouble, and they put him in jail, and he got out. I think it was a day or so after he got out, maybe the day he got out. Q. When he was having trouble over Cash's stepdaughter, the girl he did marry? A. Yes, sir. Q. Where was it you heard Cash say what you heard? A. Down in front of the Cardinal Hotel, right in front of the Cardinal rooms. Q. Down in front of the Cardinal rooming house on Okmulgee? A. Yes, sir. Q. What did he say?

"By Mr. Gumm: We object as incompetent, irrelevant, and immaterial and too remote to be admissible.

"By the Court: I believe I will sustain the objection. (Whereupon the following offer to prove is made out of hearing of the jury by counsel for the defendant:)

"By Mr. Crump: We offer to prove by this witness that the witness John Cash, about the time the trouble was up about the defendant's relations with his now wife, Cash's stepdaughter, that Cash stated if Carl Graham didn't do what was right about the matter that he was going to kill him.

"By Mr. Gumm: We object as incompetent, irrelevant, and immaterial and too remote.

"By the Court: Sustained.

"By Mr. Crump: We except. Stand aside."

Part of the redirect examination of the witness Rice is as follows:

"Q. What was it he stated to you some time ago?

"By Mr. Gumm: We object as incompetent, irrelevant, and immaterial, and for the further reason it was never disclosed to the defendant.

"By the Court: Sustained.

"By Mr. Crump: We except. (Whereupon the following offer to prove is made out of the presence and hearing of the jury:)

"By Mr. Crump: We now offer to prove by the witness that shortly after Carl Graham married his present wife, that Cash told this witness now on the stand if Carl hadn't have married her he would have killed him, and if he didn't treat her right he would kill him.

"By Mr. Gumm: We object as incompetent, irrelevant, and immaterial.

"By the Court: Sustained.

"By Mr. Gumm; And for the further reason it was never told or related to the defendant by this witness.

"By the Court: Sustained."

Certain offers to prove threats were made in connection with the defendant's examination, and are as follows:

"Q. Has Cash ever at any time had any conversation with you about you and your wife or about your relations with your wife, or anything of that kind? A. Yes, sir. Q. About—well, when the trouble—were you arrested on account of your relations with the girl? A. Yes, sir. Q. At that time did Cash have any conversation with you just after you got out of jail, made bond and got out of jail? A. Yes, sir. Q. Where was it? A. It was down on—I don't know what street. It is in front of the Cardinal rooming

house. Q. That is on this street right here, isn't it, Okmulgee? A. Yes, sir; on Okmulgee. Q. What did he say to you there?

"By Mr. Gumm: We object as incompetent, irrelevant, and immaterial, and too remote from this occurrence to have any connection with it whatsoever—the same reason as the other testimony.

"By the Court: Where have you been living since that, since the occasion that you have just been asked about?

"By the Witness: You mean since the shooting occurred?

"By the Court: No, since the occasion Mr. Crump asked you about?

"By Mr. Crump: Q. When you had the conversation with Cash in front of the Cardinal? A. Well, I stayed at this rooming house awhile, and then stayed down home awhile down close to Checotah.

"By the Court: How long were you in town before this trouble came upon the 17th day of February?

"By the Witness: Well, I was in town, I suppose—well, about a month and a week, I guess.

"By the Court: Objection sustained.

"By Mr. Crump: We except. (Whereupon the following offer to prove is made by counsel for the defendant, out of the hearing of the jury:)

"By Mr. Crump: We offer to prove by the witness Graham that very soon after he was released from jail, and before he married his present wife, that Cash told him that if he didn't do right about the matter and didn't marry the girl he would kill him, and that if he did marry her and didn't treat her right that he would kill him, and that he had a damn good notion to do it anyway.

"By Mr. Gumm: Objected to as incompetent, irrelevant, and immaterial, and too remote from this occurrence to have any connection therewith.

"By the Court: Sustained.

"By Mr. Crump: We except. (The above and foregoing was all of the offer to prove made out of the hearing of the jury, by the defendant, at this time.)

"By Mr. Crump: Q. Well, I will ask you if after that, at different times, whether or not Cash had any conversation with you in which he made any threats against you? A. Yes, sir; two or three times. Q. Can you recall any place where you were after that that he used any language or made any threats? A. Yes, sir. Q. Where? A. Well, it was on Second street, and one of them was up on Cherokee and Broadway. I mean Main and Cherokee, I guess it is, on the corner. Q. You don't know the streets very well? A. No. Q. Well, the first one of those that you had after the time out in front of the Cardinal, when was that? A. As near as I can remember—well, it was about, I guess, a month. Q. About a month after the Cardinal incident? A. Yes, sir. Q. What did he say to you at that time?

"By Mr. Gumm: Objected to as incompetent, irrelevant, and immaterial, and for the further reason it is too remote from this occurrence.

"By the Court: This is in October, 1920?

"By Mr. Crump: Yes.

"By the Court: Sustained.

"By Mr. Crump. We except. (Whereupon the following offer to prove is made by counsel for the defendant, out of the hearing of the jury:)

"By Mr. Crump. I offer to prove that Cash, at the time the witness has testified, about a month after the incident which occurred in front of the Cardinal rooming house, stated to this defendant in effect that from the information he could get he wasn't treating his wife right, and if he found out he wasn't he was going to fix him.

"By Mr. Gumm: Same objection, as incompetent, irrelevant, and immaterial, and too remote.

"By the Court: Sustained.

"By Mr. Crump: We except."

It is strenuously contended that the exclusion of the foregoing proffered evidence of threats by the prosecuting witness against the defendant was erroneous and prejudicial.

In the case of Smith v. State, 14 Okla. Cr. 250, 174 Pac. 1107, it is held:

"Threats and misconduct on the part of the deceased toward the defendant occurring prior to the homicide form of themselves no justification or excuse for the taking of human life.

"Where the element of self-defense enters into homicide cases, it is the duty of the trial court to admit evidence of threats and other misconduct on the part of the deceased toward the defendant under proper instructions to the jury covering the law of self-defense. And this would be true if there was any doubt as to who was the aggressor at the time of the killing."

For a further discussion of the admissibility of threats against the defendant by the person slain or injured in prosecutions where the element of self-defense enters, see the body of the opinion in the case of Smith v. State, supra, and cases cited therein.

The testimony of the defendant and of some of his witnesses is sufficient to present the issue of self-defense in this case. The evidence of threats offered to be proved as having been made by the prosecuting witness against the defendant was therefore competent, and the court should have admitted it.

The question now arises: Was the exclusion of such evidence reversible error?

In order to give full consideration to the questions presented by the foregoing assignment of error, it is necessary to incorporate herein other portions of the record disclos-

ing the admission of evidence of threats alleged to have been made by the prosecuting witness against the defendant.

The witness J. F. Rice was permitted to testify as follows:

"Q. Well, do you know about Carl Graham having some trouble and getting arrested over the girl that he married? A. Yes, sir. Q. That is, Mr. Cash's stepdaughter? A. Yes, sir. Q. When was it with reference to that now? A .Well, it was the day that he made bond on that charge. Now, I can't say what that date was. Q. I see, it was the day Carl made bond on that charge? A. Yes, sir. Q. And then how soon after that did he marry? A. The next day, I believe. Q. The next day—now, what was it and where was it that you heard Cash talking? A. It was on South Third street. Q. Just tell the jury. A. Just this side of Okmulgee. Q. Just tell the jury what Cash said. A. Or North Third, rather. Q. Just tell the jury what Cash said to you. A. Well, I and a fellow—

"By Mr. Gumm: We object to that, if the court please, as incompetent, irrelevant, and immaterial, and too remote.

"By the Court: I will let him answer it. A. I and a fellow by the name of Shipman was standing there talking, and he came up to me, Mr. Cash did, and he asked me where Carl was, and I told him I didn't know. I said, 'I seen him around the corner just awhile ago, about 30 minutes ago,' and he says, 'Well, I am looking for him,' and he says, 'If I find him, it won't be very healthy for him,' and he put his hand back like this. Q. Back how? A. Back just like this (demonstrating). Q. Back on his hip? A. Yes, sir; but he didn't—I just took it for granted."

Concerning threats alleged to have been made by the prosecuting witness against him, the defendant testified as follows:

"Q. Now, on the day that you did have the trouble—the day that you shot Cash, had you seen Cash that day before the time of the shooting? A. Yes, sir. Q. Where were you

when you saw him first? A. I was in the A. & C. Pool Hall. He came in there and called me out. Q. Is that the one that is run by Tom Anderson and Frank Corey? A. Yes, sir. Q. When he called you out, what did he say to you? A. Well, we walked down to the corner of Main street, and he said he heard—my wife told him that I said the child didn't belong to me, and he said he was going to kill me if I denied it, and I told him, I said, 'Why don't you do it?' and then Mr. Sherrod arrested us. * * * Q. As you were going down to the jail, after Sherrod arrested you, what happened, if anything, between you and Cash, or what did Cash say, if anything? A. Cash said, 'I will get you before night,' and Sherrod turned around and told him to shut up—'I wouldn't be making those threats if I was you.' "

In addition to the foregoing alleged threats, the defendant also testified that just before he shot prosecuting witness the prosecuting witness called him a "son of a bitch" and said, "I am going to kill you."

Further, the defendant was permitted to testify that he had heard of other threats that had been made against him by the prosecuting witness.

It appears from the foregoing excerpts from the record that certain threats alleged to have been made by the prosecuting witness against the defendant were excluded from consideration by the jury upon the ground that they were too remote and had no bearing upon the issues. The offers to prove show that such alleged threats were conditional in their nature, some depending upon the failure of the defendant to marry the stepdaughter of the prosecuting witness, and another upon the failure of the defendant to treat the stepdaughter of the prosecuting witness good, provided he did marry her. These alleged threats were all the outgrowth of a prosecution which was at the time pending against the defendant for statutory rape. The defendant married the

prosecutrix, who was a stepdaughter of the prosecuting witness, so that such threats as were based upon his failure to marry her were of very little probative force in this prosecution. However, we are inclined to the view that evidence of such alleged threats should have been permitted to go to the jury for what it was worth.

It is apparent, however, that the jury had before it for consideration evidence, by the testimony of the witness Rice, of a similar alleged threat, and also by the testimony of the defendant as to a threat by the prosecuting witness to kill the defendant on that day, and further evidence of an intention to carry this latter threat into execution at the time of the shooting.

The alleged evidence of threats which was excluded was, therefore, to a large extent cumulative of that which was permitted to go to the jury.

In Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311, it is held:

"The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result."

See, also, Clingan v. State, 15 Okla. Cr. 483, 178 Pac. 486; Kennedy v. Commonwealth, 109 S. W. 313, 33 Ky. Law Rep. 83.

It is apparent from consideration of this record that the evidence of these alleged threats which was excluded could have had very little bearing upon the result of this trial, as it was conceded that on the day of the shooting the prosecuting witness and the defendant had had a quarrel which resulted in both of them being arrested, thus clearly indicat-

ing that ill feeling existed between the parties at the time this shooting occurred.

It is next contended:

"That the court erred in not permitting the defendant to testify and state to the jury while on the witness stand why he was not living with his wife."

This evidence was properly excluded, as it had no bearing upon the question of the right of the defendant to defend himself against an attack by the prosecuting witness which he claimed was imminent at the time of the shooting.

As the shooting was admitted, an investigation into the marital troubles of the defendant was a collateral issue. Whether the defendant was or was not living with his wife, or his reasons for not living with her, were not germane to the issue of self-defense.

It is next contended that the trial court erred in giving instructions numbered 5 and 7.

The instructions here complained of are identical in substance with instructions numbered 11 and 12, approved by this court in the case of Turner v. State, 4 Okla. Cr. 164, 111 Pac. 988, and have bearing on the issue of self-defense. Considering the instructions as a whole, we believe the charge to fairly and fully cover the law of the case; that the jury was not misled by such instructions; that when so considered they are not open to the objections separately urged against instructions numbered 5 and 7; and that the court did not err in refusing to give certain requested instructions in view of the fact that the law of the case was sufficiently covered in the general charge.

The punishment inflicted in this case was well deserved. While the testimony of the defendant, if believed, tended to

present a shooting in defense of his person, his conduct in arming himself shortly before the shooting and his conduct at the time of the shooting in, according to his own testimony, shooting the prosecuting witness four or five times after the prosecuting witness had apparently abandoned any effort to attack him, cannot be justified without doing violence to those well-settled rules and statutes which point the duty to one engaged in a conflict to use only such force as is necessary to prevent injury to himself at the time.

The prosecuting witness was unarmed, was clothed in a heavy rain coat, and was engaged at the time of the shooting in his usual vocation. The defendant had previously armed himself with a loaded, deadly weapon, had placed himself in a position where he knew he was likely to come in contact with the prosecuting witness; in fact, he made no effort to avoid what he himself testified would likely be a fatal encounter. He shot the prosecuting witness eight times, bullets entering from the bottom of the feet to one inch above the heart, and the entrances and exits of these bullets are silent witnesses to the fact that the prosecuting witness and other state witnesses told the truth as to how this shooting occurred. The defendant is extremely fortunate that none of these eight wounds proved fatal. That he will be permitted to expiate this crime by serving four years in the penitentiary, instead of the balance of his natural life, should be cause for rejoicing on his part.

The judgment is affirmed.

BESSEY and DOYLE, JJ., concur.