JOHN ALCORN v. STATE.

No. A-8701. Aug. 25, 1934.
(35 Pac. [2d] 735.)

Ralph Haynes and J. F. Murray, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and Paul W. Cress, Co. Atty., for the State.

DAVENPORT, J. The plaintiff in error, for convenience hereinafter referred to as the defendant, was tried on a charge of murder, convicted of manslaughter in the first degree, and sentenced to serve a term of four years' imprisonment in the state penitentiary.

W. R. Larimer, being called by the state, testified in substance:

"My name is W. R. Larimer, I am commonly called Bob; I have resided in Bressie township, Noble county, Okla., 27 or 28 years; Charlie Larimer, the deceased, was my son; he was 49 years of age; Vernon Larimer is also my son. Vernon was married; his wife's maiden name was Avis Alcorn, a daughter of the defendant. Vernon and his wife were living about a half mile from my place, a little to the east and south, upon a place Charlie had leased. Vernon Larimer was at my house shortly after noon on July 17, 1933, with the sheriff, Mr. Harman, and I think a Mr. Cabot; they were officers of Noble county. The officers and Vernon came directly from his place to my house; he was in custody of the officers. My son Charlie came to my place while Vernon and the officers were there."

Over the objection of the defendant, the court permitted the witness to state that Vernon Larimer made arrangements with Charlie to take care of his things while he was gone.

Witness further stated the officers and Vernon left between 1 and 2 o'clock in the afternoon.

"Charlie went to Mr Bowens, about a mile and a half north and a little east to get help to make bond for Vernon, and returned to my place shortly after 4 o'clock in the afternoon. Alfred Keres, my grandson, and I went down towards Vernon's place to the corner west of the house; we saw some parties at Vernon's place and a truck was being loaded with furniture; we turned around and went back home, and I told Charlie what we had seen. He drove away in a car immediately; Alfred Keres went with him. Shortly thereafter my granddaughter Eva Keres drove me down to Vernon's home. Before we got to the corner and to the northwest of the house, we heard two shots. We drove on to the place and stopped back of the car; I thought it was Charlie's car."

Witness was then handed exhibits and asked about them relative to the position of the truck and car when he got to Vernon's house, and described the relative position of the cars when he arrived at Vernon's home, and where the car he went down in was parked. Witness stated:

"When we drove up my granddaughter exclaimed, 'They have killed him.' I expect Mr. Alcorn could have heard it. I was standing here—in front—probably ten feet of the truck where Charlie lay there on the ground. When I got out of the car I started to go to him and the defendant was standing near the body and said, 'Stay back, Bob, stay back.' He had two guns, one in each hand, pointing them at me. I asked my granddaughter to turn Charlie over; defendant was still standing with the guns, and told her not to touch him. She asked Fat Courtney to help;

I don't think he rendered any service. My granddaughter turned Charlie over so we could see his face; he was in death gasps and foam was running from his mouth and nose. Eva said, 'Get a doctor,' and I said, 'No, an undertaker is all that is needed.' My granddaughter and Fat Courtney put Charlie's body in the car; we could not crank the car. The defendant, Avis Larimer, and Fat Courtney were there. My grandson came and helped us start the car."

On cross-examination witness stated·

"At the time I was in as calm state of mind as I am now; my mind was calm enough; I cautioned them not to move anything or change anything. I did not ask Avis to give me Charlie's gun when I first drove up to the house. When I got out of the car I did not advance toward Mr. Alcorn, I started toward Charlie; I did not walk past the body of my son toward Mr. Alcorn. When I stopped my car I was about fifty feet from the truck in which the furniture had been loaded; my car was in the rear of Charlie's, it might have been ten feet from it; I was not driving the car; I do not drive a car. I was present when the photographer made the pictures that have been presented in this trial.

"Shortly after Charlie came back, about 4 o'clock, I went down near Vernon's place and saw Mr. Alcorn down there loading the furniture. I immediately drove back and told Charlie the truck was down there loading the furniture. He di dnot say he was going down there and kill the son of a bitch; I did not hear Alfred Keres say that if he was going down there to do anything like that— meaning to kill any one—I am not going. In about one to three minutes after Charlie left I asked my granddaughter to drive me down to Vernon's place; the purpose for which I was going down there was, there was apparently a conspiracy in the minds of each of us that there was something hellish going on, and we wanted to prevent any trouble, if you want to know, that is the reason why I went. We knew something had already happened. I don't know what was in Charlie's mind but my own. I

did not know that Charlie had the pistol. I did not know that when Alfred Keres declined to go with him he handed a 30-30 gun out of the car and said he did not need that gun to get the son of a bitch.

"In driving down to Vernon's place where his wife, father, and hired hand were loading the furniture, you had to go to the corner of the fence, and then turn, which made it farther than a direct line would be. We were in a Peerless car. We were probably traveling 20 or 25 miles an hour until we heard the shots; I did not hasten; my granddaughter nearly collapsed, and screamed and says, 'They have killed Charlie.' I don't know how fast we traveled or zigzagged, we kept going until we got there. I was not a bit excited; I don't get excited in trouble; I don't know how I felt, suddenly there would be trouble, but, when we heard the shots, the granddaughter says: 'They have killed Charlie.' I did not know Charlie went to Vernon's home for any trouble; I know there was something connected with whisky. Charlie was authorized to look after Vernon's stuff. What caused me to feel uneasy was the whisky, and circumstances leading up to it; whoever was representing Vernon's wife was taking the furniture. Of course, I knew reasonably there would be trouble when I saw the truck; before I had seen the truck I had not expected anything; I did not talk with Charlie that evening about 4 o'clock. When he left the house Alfred Keres told him there was a truck there getting the furniture. I just heard the shots and drove on down to the scene of the difficulty. At the house is just a bare ground—might have been some grass. I did not recognize either one of the pistols in the hands of John Alcorn as being my son Charlie's pistol.

"I knew my son Vernon worked the land north of the building on a fraction; I knew he was living in the house by an agreement."

On redirect witness stated he followed the son down to Vernon's house; that he did not know how to use a gun. Witness admitted he knew Vernon and his wife were oc-

cupying a part of the house where the difficulty took place.

There are a number of pages of the record taken up by questions and answers on the contract under which Vernon Larimer and his wife were occupying the house at the time of the difficulty, which it is not necessary to refer to, as all parties admit Vernon Larimer and his wife, Avis Alcorn Larimer, were rightly in possession and occupied a portion of the home where the difficulty occurred.

The record discloses some time prior to the difficulty the defendant in this case had been turned in on a charge of violating the prohibition law, and he accused Charlie and Vernon Larimer of being responsible for his being arrested.

The record further shows that on the day of the killing the defendant, accompanied by his daughter, went to a phone and phoned the sheriff to come out to Vernon Larimer's home and that he would find whisky, either in the house or a beehive, and, when the sheriff came, defendant told them where to find the whisky; whisky was found and Vernon Larimer taken into custody by the sheriff, and taken to the county seat, where he was at the time of the trouble.

The record further shows that Vernon Larimer and his wife were not living in harmony, and were about to or had separated. At the time the difficulty occurred, at the request of Vernon Larimer's wife, the defendant in this case and his hired hand, Fat Courtney, and Avis Alcorn Larimer were at the home of Vernon and Avis Alcorn Larimer loading furniture into a truck. The testimony clearly shows there was ill feeling existing between Charlie and Vernon Larimer and the defendant, and that Charlie Larimer and the defendant were both armed on the day of

the trouble; that before Charlie started to the house a gun was taken out of the car and Charlie went down to the Vernon Larimer place with a pistol.

The testimony of Eva Keres as to what took place the day of the killing is in substance the same as the witness W. R. Larimer; she being the one who drove the car from his home to where the killing took place. There are several pages of the record taken up with the examination of the doctor as to where the bullets took effect on the body of Charlie Larimer, and as to the location of the cars at the place where the killing took place, and as to photographs which were made after the killing and after the cars had been removed, and cars placed in the position it was claimed the cars were at the time of the killing. It would serve no useful purpose to incorporate in this record at length all this testimony, as it does not in any way whatever tend to show who was the aggressor or who fired the first shot. Both parties fired shots—which fired the first, according to the record, is a controverted fact according to testimony of eyewitnesses, and circumstances on the positions of the cars, as introduced by the state.

The defendant, testifying in his own behalf, in substance states:

"I am 55 years old; have lived in Noble county about eight years; have been living on the 50-50 Ranch for about one year, which is about four miles east and one mile south from Marland, to the northeast corner. Avis Larimer is my daughter. Avis and her husband had lived on the place where the trouble occurred since their marriage, which was last August a year ago, until they separated. On the morning of the day of the killing my daughter sent word to bring the truck and come down, as she was going to move her furniture home. When I received the request, I told the hired hand to take the truck and go down and get the furniture; the hired hand drove

the truck down about 3 o'clock in the afternoon, and I drove down in my car to Vernon and Avis Larimer's home. When we got there the hired hand backed the truck to the west door, and the girl was getting ready to move her stuff. We went to loading her things in the truck. Vernon Larimer had been taken by the sheriff to Perry on a whisky charge. After we got down to the place I saw some one drive to the corner where the road makes a turn and go back north.

"Bob Larimer's home is about a half mile north of this corner. Shortly thereafter Charlie Larimer drove up in his car, and stopped in about four feet of my car. The back end of the truck was up to the south side of the west door. My car was parked just west of where Charlie parked his car—about seven or eight feet apart; when Charlie drove up he jumped out of his car and as he came out of the car this way, he says: 'Alcorn, God damn you, unload that furniture.' His gun was a .38 special; the gun you have handed me is the identical gun; Charlie fired directly at me, and I ducked behind my truck. I got my gun, an automatic, that has been exhibited here, or one just like it; I had an A-380 automatic Remington. When I pulled my gun I ducked under the truck where I could see Charlie Larimer and fired. While I was under the truck he fired two shots. I was not very calm at the time. When I fired the first shot Charlie Larimer was standing at the front wheel of my automobile; that was about at the left front wheel of his automobile; after Larimer shot at me and I got under the truck I fired as fast as I could; I don't know where I shot either time; Charlie Larimer fell and kindly whirled and holloed, I did not hear what he said; I don't know where I hit him, but he fell on my automobile and dropped his gun between the hood and the fender, behind the light; he was grabbing for the gun when he went down and kicked up his foot—I don't know which foot. I continued firing as long as he continued to try to get his gun; when he slumped to the ground I ceased.

"I got out from under the truck and Bob Larimer drove up; the girl jumped out of the car and I said: 'Avis,

get the gun.' She went up and took the gun by the barrel and handed it to me. Bob Larimer and his granddaughter came up right south of Charlie's car; Bob Larimer jumped out of his car, and said: 'Give me Charlie's gun.' My daughter Avis had the gun and I told her to give it to me. Bob Larimer was coming after me and I stuck this gun up and I says: 'Mr. Larimer, don't come another foot.' I never raised the gun, I says: 'Mr. Larimer, stay back.' I knew Charlie had been fatally wounded; he was on the ground and was not able to get up and get the gun. I did not shoot him any more. I fired the first shot from under the truck because I had to save my own life or my daughter from injury. After Bob Larimer drove up, I told Fat Courtney, who was working for me and who had driven the truck to the house, to assist in putting Charlie Larimer in the car, and he did. Bob Larimer at the time was raving like a mad man."

On cross-examination witness stated he lived on the 50-50 Ranch. Witness was asked with reference to an election on July 11, 1933, as to what took place at the Bressie schoolhouse, and denied certain remarks he had made about Charlie and Vernon Larimer; admitted he had been turned in for whisky some time before this trouble; and admitted he told the sheriff where to go to find the whisky at Vernon's place.

Avis Larimer, testifying on behalf of the defendant, stated:

"Me and my husband had been having trouble the last three or four days prior to the killing, and I tried to get him to give me one-half of the furniture, but was unable to do so. About a week before the trouble my husband said if I left him he would kill my father and myself, or any one who tried to move the furniture out of the house. I told my father what my husband said about two or three days after he made the threat; I asked my sister to tell father that Vernon was in jail and I wanted to move home, and to let's give him a fair deal, and he said all right. My

father and Fat Courtney came down with the truck and we were loading the furniture; while we were loading, I noticed the Larimer car drive down the road to west of the house, and turn back north, and immediately thereafter Charlie Larimer came to the house. Bob Larimer lived north of where the car turned and went back. Charlie came down the same road that I had seen the car come down and turn back; when he drove into the yard he jumped out of the car and said: 'By God, Alcorn, unload that furniture,' and started shooting. I was standing in the west door; my father was standing just on the west side of the truck, right close to the rear of the truck; after Charlie shot my father ran behind the truck and crawled under it and Charlie fired three shots; Fat Courtney was standing by the door of the truck when the second shot was fired; my father at that time was under the truck; as soon as he got under the truck he started firing. I tried to get Charlie to leave; that I did not want any trouble but he said he wouldn't do it; that it was Vernon's furniture, and that it was under Merle Harmon's control and he was going to protect it. I told Charlie we were dividing the furniture, and I was leaving Vernon's half. My father's shots struck him; he fired a shot about the time he fell on dad's car; father shot three shots in rapid succession about the time Charlie fell on the car. I had seen Charlie Larimer three times that day; he was at the house shortly after 11 a. m., the second time between 12 and 1 o'clock, and I saw him again close to 2 o'clock; I am just approximating the time. He seemed to be drunk. When he left the house he took a rifle I had thrown in the well, after Vernon had threatened my life, with him; it was a 30-30."

Witness was then asked several questions with reference to the photographs and some property that Charlie Larimer should have had in some of the rooms at the house at the time of the trouble, all of which was immaterial to the issues in this case. Also asked questions along the line as to whether or not Charlie Larimer was down to the house in the morning, and up to 2 o'clock was

drinking, and as to the witness' statements to the county attorney shortly after the killing.

All of the testimony of Avis Larimer and Fat Courtney as to what took place at the time of the killing, and the cause leading up to it, in substance is the same as the defendant John Alcorn's testimony. Several witnesses were called to testify on behalf of the defendant, who testified that the reputation of Charlie Larimer being a quarrelsome, abusive, and dangerous man was bad.

The above and foregoing testimony is all that is necessary to set out in this opinion in order to arrive at a proper conclusion as to whether or not the defendant was accorded a fair and impartial trial. To set out all the immaterial questions and answers in the record would extend this opinion to an unreasonable length.

The defendant has assigned 13 errors alleged to have been committed by the court, which errors he insists are sufficient to warrant the court in reversing this case and granting him a new trial.

The first question argued by the defendant is the question of the admission of testimony offered by the state as to a conversation between the deceased and his brother referring to the property of Vernon Larimer, which conversation was in the absence of the defendant, and shed no light upon what took place at the home of Vernon Larimer the day of the killing. However, in view of the testimony of the defendant that deceased had been down to the home of Vernon Larimer on one or more occasions the day of the killing, and in view of the further fact that Mrs. Vernon Larimer knew the deceased claimed to be looking after Vernon's interest in the household goods, the admission of the testimony is not such an error

under the facts and circumstances as would warrant a reversal.

The record in this case is full of testimony immaterial to the issue, but it seemed that the prosecution was seeking to prove everything that might have taken place in the lives of the defendant and deceased since the marriage of the brother of the deceased to the daughter of the defendant. It only tended to burden the record and did not assist in any way whatever in arriving at the correct solution of the issue involved.

It is next urged by the defendant that the court erred in its instructions Nos. 22 and 23, which instructions are as follows:

"No. 22. You are further instructed that self-defense under the law is a defensive and not an offensive act, and for a person to avail himself of a plea of self-defense, in order to justify a killing it must reasonably appear to him at the time he fired the fatal shot that the act or acts upon the part of the deceased by which the defendant seeks to justify the killing was such an act or acts as made it reasonably appear to him at the time that he was in danger either of losing his own life or of suffering great bodily harm, and it is the duty of the person so threatened with danger to his life or great personal injury being done to use at the time all reasonable means apparent to a reasonable person under the circumstances to avoid such danger before taking human life; except that he is not bound to retreat to avoid such necessity or apparent necessity of killing, provided he has done no act on his part to bring about the attack, if any, by the deceased.

"No. 23. You are further instructed, in this connection, that the law of self-defense is given to the citizen for his protection and it cannot be pleaded as a defense by one who himself is the aggressor or who enters voluntarily into a difficulty armed with a deadly weapon, no matter

in how much danger he may be placed in the course of the difficulty, nor how imminent his peril may become."

The defendant in his brief and oral argument relied upon Price v. State, 1 Okla. Cr. 383, 98 Pac. 447, 458, to sustain his argument and contention that instructions Nos. 22 and 23 were erroneous. The defendant further insists that the Price case is the only case that he had been able to find where such an instruction as given in this case had been given, and the holding of this court had apparently been followed since the Price opinion. He argues at length and insists that, when the court told the jury, "And it is the duty of the person so threatened with danger to his life or a great personal injury being done, to use at the time all reasonable means apparent to a reasonable person under the circumstances to avoid such danger before taking human life," the instruction placed the burden on the defendant to prove that he had so acted; that the instruction took from the defendant the long-established right to act in his own defense upon the reasonable appearance of danger. As argued by the defendant, the question for the jury to determine under proper instructions of the trial court was the question as to whether or not the deceased or defendant was the aggressor, and did the defendant shoot the deceased before he had fired at the defendant? The record shows beyond any question there was hard feeling between the defendant and the deceased, and that the deceased had gone to his brother's home and the home of the daughter of the defendant for the purpose of interfering with and preventing the defendant, his daughter, and the hired hand from moving certain furniture from the home, in the absence of the brother Vernon Larimer.

In considering the instructions of the court, it is necessary to consider them as a whole, and if, when so con-

strued, they clearly and correctly state the law, then the instructions are sufficient. This does not mean that an erroneous instruction upon a material issue can be cured by a correct instruction in another paragraph of the court's instructions. The instructions should be clear, explicit, and free from ambiguities and contradictions, so as to not mislead the minds of the jurors. The language used by the court in its instructon No. 22 was before this court in Turner v. State, 4 Okla. Cr. 164, 111 Pac. 988, 998, and was approved by this court as a correct statement of the law on the question of self-defense. In instruction No. 11, Turner v. State, supra, the court in part instructed the jury:

"That the act upon the part of the deceased by which the defendant seeks to justify the killing was such an act as made it reasonably to appear to him at the time that he was in danger either of losing his life or of great personal injury being done him, and it is the duty of a person so threatened with danger to his life or of great personal injury being done him to use at the time all reasonable means apparent to a reasonable person under the circumstances to avoid such danger before taking human life," etc.

The language in the court's instructions in Turner v. State, supra, was approved by this court in Brantley v. State, 15 Okla. Cr. 6, 175 Pac. 51. In Graham v. State, 25 Okla. Cr. 372, 220 Pac. 967, this court, in construing the instruction, states the instructions here complained of are identical in substance with instructions Nos. 11 and 12, approved by this court in Turner v. State, 4 Okla. Cr. 164, 111 Pac. 988, and have bearing on the issue of self-defense.

Considering the instructions as a whole, we believe the charge to fairly and fully cover the law of the case; that the jury was not misled by said instructions; that, when

so considered, they are not open to the objections separately urged against instructions 22 and 23; and that the court did not err in refusing to give certain requested instructions, in view of the fact that the law of the case was sufficiently covered in the general charge. Under the evidence in this case and the instructions of the court, the jury could have found the defendant guilty of murder, manslaughter in the first degree, or a verdict of not guilty. After hearing the evidence and instructions of the court, the jury found the defendant guilty of manslaughter in the first degree.

The evidence is sufficient to sustain the judgment. No errors appearing in the record to warrant a reversal, the judgment of the trial court is affirmed.

CHAPPELL, J., concurs. EDWARDS, P. J., not participating.