## THOMAS NEILL v. STATE.

No. A-10980. June 1, 1949.

(207 P. 2d 344.)

Jerome Sullivan, of Duncan, and C. S. McCuistion, of Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, P. J. The defendant, Thomas Neill, was charged by information filed in the district court of Comanche county with the crime of murder, was tried, convicted of manslaughter in the first degree, and pursuant to the verdict of the jury was sentenced to serve ten years' imprisonment in the State Penitentiary, and has appealed.

Three propositions are presented by the appeal: First, the verdict and the judgment are not sustained by the evidence and are contrary to the law; second, the defendant was prevented from having a fair trial for the reason that the special prosecutor conducted the prosecu-

tion almost in its entirety; third, the court erred in giving instruction No. 11 to the jury.

The first proposition requires a summation of the evidence. The defendant, Thomas Neill, and the deceased, John Slimp, were each livestock traders. Slimp lived in Lawton while the defendant resided with his son on a farm about one and one-half miles from Walters, Okla., in Cotton county. On February 18, 1947, both the deceased and the defendant had gone to the sale barn at Lawton to attend the weekly livestock sale. Shortly after 11 o'clock a. m., an individual by the name of Dill brought a load of hogs to the sale barn. The deceased was not present when the hogs arrived but the defendant, Neill, and one McKeever, who was buying livestock in partners with Neill on that particular day, approached the owner of the hogs and asked him the price he had placed on the hogs. There is some variance between the testimony of witnesses for the state and defendant as to what then transpired. However, the witnesses generally agreed that McKeever made an agreement with the owners of the hogs for the purchase of the hogs for $90, and McKeever was to pay a commission to the parties who operated the sale barn over and above the price of the hogs.

Witnesses for the state testified that about this time the deceased arrived and stated "I will pay $91.00"; that the defendant became enraged because of what he considered an interference on the part of the deceased in a sale which defendant thought had already been consummated, and struck at the deceased with a stick which defendant carried in his hands and which, in the parlance of the livestock traders, was known as a "bull stick"; that the son of defendant grabbed defendant, pushed him back and made him desist; that a constable who was

standing near by also came up to where the fracas was occurring and ordered the parties to desist and stated that if they did not he intended to carry them to jail. After this occurred the defendant and his son went off toward their car and the deceased walked off toward the loading chute. The actual auction sale had not yet started, but it was the custom of traders to purchase livestock before the sale commenced if they could make an agreement with the owners of the livestock with the understanding that a commission on the sale would be paid to the operators of the sale barn.

The homicide occurred about 30 minutes after the difficulty which arose over the hogs. There were a large number of cars and trucks gathered around the sale barn but a driveway leading to the loading chute was kept open so as to enable trucks to back up to the loading chutes for the purpose of removing animals which had been purchased at the sale.

Mrs. Frank Johnson, a witness for the state, testified that she was sitting in a pick-up truck crocheting with the window glass up; that about noon she saw two men whom she later learned were Neill and Slimp; that she heard loud profane language but did not know whether it came from either or both of the men; that both men were walking north with the defendant about 12 or 15 feet in front of deceased; that defendant took out a gun and shot the deceased; that after the first shot, deceased made a turn to the southeast and defendant fired a second shot and deceased fell to the ground; that she did not see any knife or weapon of any kind in the hands of deceased; that immediately after the shooting the son of defendant appeared and said "let's get out of here", and immediately the father and son left, walking rather fast.

The witness, Albert McCracken, testified concerning the fracas over the hogs at the loading pen and that when the fuss had ended, the deceased stated "just forget it, it is all in history"; that he was to meet Slimp at noon; that 15 or 20 minutes later, while Slimp was on his way up the driveway to meet him, he saw defendant pull a gun; that he yelled to the deceased "that fellow is pulling a son-of-a-bitch of a gun", and deceased turned his head and started to turn to the right; that defendant fired two shots and deceased fell; that he never heard deceased or the defendant say anything; that deceased did not have any gun, knife, or other weapon; that the witness ran immediately to the deceased and then to the coffee shop to call an ambulance; that he then returned and remained with the deceased until he was removed in an ambulance; that he saw a small knife picked up from under the body of deceased which was not opened.

There were other witnesses who testified for the state who purported to have seen the shooting; their testimony varied from the testimony given by Mrs. Johnson and that of the witness McCracken, but in the main supported the testimony of both of these witnesses.

The testimony of the undertaker and doctor who examined the deceased was that he had been killed by a bullet which struck him behind the left ear.

The defendant interposed a plea of self-defense and testified in his own behalf that he was 59 years of age; crippled, and smaller than the deceased; that he had known the deceased for about 25 years, but had never had any trouble with him prior to the day of the shooting; that at the time of the first difficulty over the hogs, Slimp cursed him because he was from another county and that he lived there in Lawton and would buy the

stock; that Slimp reached for a hammer on the top of a sales ticket box on the fence and, when he did so, the defendant hit at Slimp with a willow stick about three feet in length which he held in his hand; that defendant's son and a constable stopped the fracas and the constable told the deceased that if he did not shut up he intended to lock him up; that he and Slimp then agreed to forget the difficulty; that he then walked towards the caretaker's house and sat down on the running board of a car; that he was sick at his stomach and vomited; that a few minutes later, Slimp came from the livestock pens and said "By God I thought I told you to leave"; that he then got up from the car and walked away from Slimp and went farther west and sat down on the bumper of another car while Slimp went south to the pens; that shortly thereafter Slimp came out of the pens and started walking toward him; that when he arrived within about 40 feet of him he started cursing; that Slimp said he intended to cut the heart out of defendant and pulled a knife from his pocket; that defendant then commenced walking north and Slimp kept coming toward him; that he told Slimp to stop two or three times but Slimp did not do so; that he fired the first shot intending to fire over Slimp's head and scare him; that Slimp then attempted to open his knife; that he was trying to get away from Slimp and was afraid Slimp would kill him if he got hold of him; that he then fired the second shot; that he had a gun with him because he had been attending livestock sales and when he returned home on the bus it was generally at 2 or 3 o'clock in the morning, and that he was afraid of being robbed and generally had $200 or $300 in his pockets.

The son of defendant and other witnesses testified to facts tending to corroborate defendant's version of the homicide.

By statute it is provided:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." 22 O.S. 1941 § 745.

In construing this statute it has been held in Jones v. State, 20 Okla. Cr. 233, 202 P. 187, that:

"Even though the evidence on the part of the state indicative of the guilt of the defendant may not be convincing, if there is any substantial evidence tending to prove the guilt of the accused, that question is properly for the jury, and a demurrer to the evidence, under such circumstances, is properly overruled."

Under some of the evidence of the state, the deceased was not walking after the defendant at the time the shots were fired but was on his way to eat lunch with the witness McCracken. However, from all of the evidence, we are convinced that the deceased was advancing towards the defendant. As to whether the facts surrounding the homicide were sufficient to justify the defendant in taking the life of the deceased was an issue for the determination of the jury.

Under the second proposition it is shown that the attorney, Lawton Burton, was employed by the widow of deceased to assist in the prosecution of the case. He made the opening statement to the jury, and conducted the examination on the part of the state of all of the witnesses except one. The county attorney examined this

one and made the opening argument to the jury. The special prosecutor then made the closing argument for the state.

It is the contention of counsel for defendant that a special prosecutor may be employed to assist a county attorney in the prosecution of a criminal case, but that he should not be permitted to supersede the county attorney and allowed to conduct the prosecution in its entirety.

In the recent case of Perry v. State, 84 Okla. Cr. 211, 181 P. 2d 280, 285, this court quoted from McGarrah v. State, 10 Okla. Cr. 21, 133 P. 260, as to the power and duties of a county attorney as follows:

" 'We know of no rule of law whereby a public officer may delegate power or authority involving official discretion or responsibility, except as prescribed by the statute. The law has very carefully guarded the administration of public justice from any interested or unauthorized intermeddling. The county attorney is a very responsible officer, selected by the people and vested with a wide personal discretion, intrusted to him as a minister of justice. There are many reasons why a power of this kind should be confined to the prosecuting officer. He is expected to be impartial in abstaining from prosecuting, as well as in prosecuting, and to guard the real interests of public justice in favor of all concerned.

" 'It is therefore of the highest importance to the public that this power should be carefully exercised, and that the responsibility should rest upon the officer to whom it is confided. * * *

" 'The public have a right to insist upon the performance of public duties that are strictly official in the prosecution of crime by county attorneys and assistants duly appointed and qualified as provided by law, and we think it would be directly contrary to publc policy to allow or permit any general delegation of the county attorney's power or responsibility in this respect.' "

In Cole v. State, 83 Okla. Cr. 254, 175 P. 2d 376, 380, this Court stated:

"It often occurs, as we have noticed it, in criminal cases that special prosecutors, who have been employed by private citizens, in their zeal to convict and in their determination to earn their money, make improper arguments in their appeal to the jury. This is unfortunately true not only in this case but in nearly every other case where the county attorney permits the special prosecutor to take the lead in the case. Often times the person selected as special prosecutor is a skilled lawyer who has devoted most of his time to the trial of civil cases, and who overlooks the fact that a prosecuting attorney represents the public. The county attorney serves no private interest. His duty is to present the facts in a fair manner, and it is just as important that he shield the innocent as to punish the guilty. He may strike hard blows, but they must be fair ones. Too many special prosecutors seem to feel it their duty to secure a conviction whether the means used are fair or foul."

This court has never yet adopted a rule specifically limiting the acts of a special prosecutor in the trial of a criminal case. Special prosecutors are permissible if agreeable to the county attorney and their acts and conduct of the trial are under the supervision and control of the county attorney. When a special prosecutor is employed, because he is serving a private interest, the trial judge and the county attorney should keep a close check upon his activities and not allow him to inject into the trial prejudicial matters which affect the substantial rights of the accused. In the instant case, the special prosecutor, in so far as the conduct of the trial was concerned, took the leading role. However, the county attorney was present at all times and the trial of the case was under the control and supervision of the county attorney. Counsel for the defendant have not pointed out

any place in the record where the special prosecutor made improper or unfair statements either in the introduction of evidence or in his closing argument to the jury.

We know of no decision that would justify us in reversing this case because a special prosecutor took the lead in the prosecution where there is an absence of any improper or prejudicial acts or statements on the part of the special prosecutor.

Instruction No. 11 to which complaint is made provides:

"The defendant in this case has interposed the plea of self-defense; and in this connection you are instructed that under the law of this State, every person is given the right to act in his own necessary self-defense to protect himself from an attack, or threatened attack, of his adversary, and where a person is in a place where he has a right to be, as was the defendant in this case, and is not the aggressor in bringing on the difficulty, and is attacked, or threatened to be attacked by another person in such a way as to place him in danger of death or of receiving great bodily harm at the hands of his adversary, then such person so attacked, or threatened to be attacked, is not bound to retreat, but has the right to stand his ground and to repel the danger, or threatened danger, in which he is placed at the time, and with such force as is reasonably necessary to repel such attack, or threatened attack, to protect himself from death or of serious bodily injury at the hands of his adversary. But, under the law, when the necessity for the use of force ceased, the right to use force ceased."

Counsel for defendant state that the instruction with the exception of the last sentence was requested by the defendant, but that when the last sentence was inserted by the trial judge, it destroyed the effect of the instruction and that said instruction with the last sentence

added was misleading, ambiguous, and contradictory to the other instructions which were given.

The vice of the instruction as pointed out by counsel for the defendant is that it leaves for the determination of the jury the question as to the appearances of danger which would justify the taking of human life and did not require them to view it from defendant's standpoint.

In Burroughs v. State, 80 Okla. Cr. 271, 158 P. 2d 723, the law applicable to the construction of instructions given in the trial of a homicide case is stated as follows:

"Instructions must be considered as a whole, and when considered altogether, if they fairly and correctly state the law applicable to the case, they will be sufficient.

"That an instruction is poorly worded is not ground for reversal if the same does not mislead the jury and the instructions considered as a whole are free from prejudicial error."

In addition to the instruction complained of, the trial court gave several other instructions on the law of self-defense. Among these instructions appeared the following:

"You are further instructed that if a person is attacked, or threatened to be attacked by another person, in a way as to induce in his mind a reasonable belief that he is in danger of losing his life or of suffering great bodily injury at the hands of his adversary, he is justified in defending himself, although the danger is not real but only apparent. In such a case a person will not be held criminally responsible if he acts in his necessary self-defense, from real and honest convictions as to the character of the danger induced by reasonable appearances, although he may be mistaken as to the extent of the actual danger. A person need not be in actual, imminent danger of his life or of receiving great bodily injury at

the hands of his adversary before he acts in his necessary self defense. It is sufficient if, in good faith, at the time he has reasons to believe and does believe at the time, from all the surrounding facts and circumstances, as they appeared to him at the time, viewed from his standpoint, that he is in imminent danger of losing his life or of receiving great bodily injury at the hands of his adversary.

"In determining whether or not the defendant, at the time of the shooting in question, was in danger, or apparent danger, of receiving death or great bodily injury at the hands of the said John Slimp, you are instructed that you must view the circumstances from the standpoint of the defendant, as they reasonably appeared to him at the time. That is, that the surrounding circumstances under which he fired the fatal shot, as they reasonably appeared to him at the time, were sufficient to excite the fear of a reasonable person that his life was in danger, or that he was in danger of receiving great bodily injury, or death, at the hands of his adversary, and that he really acted under the influence of such fear and belief at the time he fired the shots.

"When a person reasonably and in good faith acts only in his necessary self-defense, then it makes no difference whether the feared danger is actually real or only apparent, if the person acting in his necessary self-defense actually and honestly believes at the time that he is in danger of receiving death, or serious bodily injury at the hands of his adversary; and in determining these questions, the law requires you to view the circumstances from the defendant's standpoint as they reasonably appeared to him at the time.

"You are further instructed that if you find and believe from the evidence in this case, or entertain a reasonable doubt thereof, that the deceased, John Slimp, wrongfully provoked and brought on the difficulty in which he lost his life, and that he made, or threatened to make, an unlawful attack upon the defendant, and that it reasonably and in good faith appeared to the defendant at the time that he was in danger of receiving death,

or great bodily injury at the hands of the said John Slimp, and that the defendant, acting in his necessary self-defense at the time, used only such force or means as reasonably appeared to him to be necessary to repel the attack, or threatened attack, to protect himself from death, or serious bodily injury, at the hands of the said John Slimp, then and in that event you should return your verdict acquitting the defendant."

After considering all of these instructions, we believe that taken as a whole, they fairly and correctly stated the law applicable to the issue of self-defense and were not misleading.

The court repeatedly admonished the jury in these instructions to view the circumstances at the time of the homicide from the standpoint of the defendant, and we do not believe that the addition of the last sentence to instruction No. 11, to which complaint is made by defendant's counsel, confused the jury or caused them to fail to give effect to the other instructions.

The judgment and sentence of the district court of Comanche county is affirmed.

BAREFOOT and BRETT, JJ., concur.