### HAINES v. STATE.
### No. A-11962.

Criminal Court of Appeals of Oklahoma.
June 23, 1954.
Rehearing Denied Oct. 20, 1954.

Ungerman, Whitebook, Grabel & Ungerman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error Leo Edward Haines, defendant below, was charged by information in the district court of Tulsa county, Oklahoma, with the crime of premeditated murder, Title 21 O.S.1951 § 701, allegedly committed against the person of Royal Loyd Warner, on November 17, 1952, by means of a .38 caliber revolver. The crime was committed in a tavern in the city of Tulsa, Tulsa county. The defendant was tried by a jury, convicted of manslaughter in the first degree, Title 21 O.S. 1951 § 711, and his punishment fixed at 25 years confinement in the State Penitentiary at McAlester; judgment and sentence was entered accordingly, from which this appeal has been perfected.

The facts as established by this record and as found by the jury to support the conviction, and, as conceded by the defendant in his brief, "would sustain a conviction of murder". Briefly they are as follows. The decedent Royal Loyd Warner had been married to Mary Helen Johnston before her divorce from him, and prior to her subsequent marriage to Haines. At the

time of the killing herein on November 17, 1952 though her divorce from Warner was not obtained until October 1952, she had been living with defendant Haines since July 1952 before her marriage to him in a clandestine relationship contrary to law. This relationship began about three weeks after she met the defendant Haines. Robert B. Johnston, Helen's father, testified in support of the relationship, that he and his wife "decided that as long as they were going to get married, she (Mary Helen) was better off with him". The real reason for this attitude, however, was probably because it afforded their daughter some protection, she had not been able to get as against Warner's repeated beatings both during and after the dissolution of her marriage to Warner. This abuse and beatings by the decedent were not limited to Mary Helen but on several occasions the record disclosed included her father, and many other persons in the vicinity of Tulsa had been the recipients of Warner's abuse. The record shows that the defendant Haines and Mary Helen had been living in fear and semi-seclusion at the Hotel Avalon in Tulsa on the day of the killing. The decedent apparently did not know who his former wife's new friend was. It does appear that defendant Haines, however, was fully informed of the decedent's penchant for violent abuse. No doubt he was very much afraid of Warner. But, in this connection this court has held that "no person has a right to kill another through unfounded fear or cowardice", Reed v. State, 2 Okl.Cr. 589, 103 P. 1042, 1043; Fields v. State, 85 Okl.Cr. 439, 188 P.2d 231, 241. The state's evidence supports such a killing herein. This record as revealed by the testimony of the only unbiased eyewitness discloses, there was no overt act on the part of Warner that he was about to endanger the life of the defendant. The defendant and the then divorced wife of the decedent had gone to the Diamond Tavern near the Avalon Hotel, about 7:30 the night of the alleged murder. Mary Hunt, wife of the proprietor, saw them come in and observed them at the time of the killing. She was the only eyewitness other than the defendant and the Johnston woman, to

the things that preceded and accompanied the firing of the first shot. She related that they came in and sat down at the bar and ordered beer. She left for her evening meal and came back. When she returned Mrs. Hunt testified, that Mary Helen Johnston slipped off her seat at the bar and went to a back booth. Warner, she related, came in and with a glass of beer in his hand joined her in the booth. This, she testified, was about 8:30 p. m. Mrs. Hunt said at this time there was a disturbance in front of the bar and she walked to the front door where she observed the defendant Haines in the telephone booth. He left the booth she stated and came past her in front of the cash register and went to the men's rest room, where he remained only a short time. When he came out she testified she was looking at him all the time. The defendant she related, walked to the booth where Mary Helen Johnston the former Mrs. Warner was seated with Warner, as though he was going to sit down, but he didn't sit down, he leaned over the booth and fired the first shot. Warner turned around and just looked at him. Mrs. Hunt testified that when this first shot was fired Warner was talking to his former wife, he was not looking at defendant Haines until Haines fired the first shot. Warner's hands she related were on the table, he was not doing anything with them. When Warner looked at Haines the other shots were fired killing the decedent, five in all, the record reveals. Haines then took hold of the Johnston woman's arm and said, "come on", Mrs. Hunt testified. The decedent Warner fell under the booth on his face. The foregoing evidence would have supported a conviction for murder. Certainly the evidence supports the conviction of the lesser offense of manslaughter in the first degree, Title 21 O.S.1951 § 711.

The defendant plead self defense. In substance he testified and the Johnston woman corroborated him, that the decedent came in, sat by them on the stool and started threatening her. Defendant's identity was not known to Warner. Haines slipped off the stool at the bar and called Mary Helen's father on the telephone and told him of the threats and abuse to which

his daughter was being subjected by Warner. He arranged with Mr. Johnston to get his five chambered .38 caliber pistol and left by cab, where at the Johnston home he procured the gun, returned to the tavern, went to the rest room and from there approached the booth, saying, "Come on, Mary, let's go". He testified Warner said, "Why, you son of a bitch, I'll just kill you, too". Warner reached for his pocket he related and the defendant pulled the pistol from his belt line and fired the first shot. Warner arose and defendant fired the remainder of the shells in the gun. (The record shows Warner did not have even an ordinary pocket knife in his pocket.) As suggested by the Attorney General it is foolishness to presume he would be reaching for a weapon that wasn't there. The jury did not believe this testimony. The defendant's record was none too conducive to enhance his credibility. He had plead guilty to a charge of robbery by force, was convicted of interstate transportation of a stolen automobile, had been convicted by a military court martial of desertion and sentenced to 10 years, and escaped. The record shows he was released on the auto theft charge as late as July 7, 1952. These facts and the Johnston woman's clandestine relationship with the defendant, gave little foundation for credence of their story of the killing as opposed to that of the unbiased only other eyewitness Mary Hunt. The evidence was entirely sufficient to support the verdict of the jury.

It thus appears there was a sharp conflict in the version of the defense of the killing and that established by the state. It has been held in this regard that the verdict of the jury in a homicide case based upon conflicting evidence will not be disturbed on appeal on the ground that the evidence is insufficient to sustain the judgment. Akins v. State, 91 Okl.Cr. 47, 215 P.2d 569.· In fact, the Criminal Court of Appeals does not weigh the evidence in a homicide prosecution and determine a conflict, since those are matters for the determination of the jury under proper instructions. Suber v. State, 91 Okl.Cr. 405, 219 P.2d 644.

In his efforts to obtain a reversal of the conviction herein, the defendant complains the trial court erred in its instructions No. 11 and 13, and in refusing to give his requested instructions 1, 5, 9, 12 and 16.

Instructions 11 and 13 given by the trial court erroneously assumed, that the defendant under the law had the right to defend Mary Helen Johnston (she being the defendant's mistress) under the authority of Title 21 O.S.1951, § 733, the pertinent part of which reads as follows:

"Homicide is also justifiable when committed by any person in either of the following cases: * * *

"2. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, * * *."

Websters International Dictionary gives many shades of meaning to the term mistress. Among these numerous definitions are two which are peculiarly applicable to the case at bar. These definitions are, a woman having power, authority, ownership; and a woman or something personified as a woman, that exercises authority, has power, or command, is chief, etc; the female head of a family, and school, etc. A mistress is further defined in Websters International Dictionary as "a woman with whom a man habitually consorts unlawfully or who occupies wholly or partly the position of wife to a man without being married to him; a woman living with, or supported by, a man as his paramour." It is apparent that these definitions present a dilemma to this court, as they no doubt did to the trial court. In such a situation courts are compelled to resort to rules of construction.

"The fundamental rule of construction is to ascertain the intention of the lawmakers in order that the true meaning of the legislature may be determined. To accomplish this purpose all parts of the act relating to the subject should be considered together. A later clause or provision may qualify an earlier one, and the converse is equally true." Ex parte Higgs, Okl.

Cr., 263 P.2d 752, 756; Ex parte Hunnicutt, 7 Okl.Cr. 213, 123 P. 179.

The words, phrases, and sentences of a statute are to be understood as used, not in any abstract sense, but with due regard to the context and that sense which best harmonizes with all other parts of the statute. State ex rel. Bitter Root Valley Irrigation Co. v. District Court of Fourth Judicial District, 51 Mont. 305, 152 P. 745, 746, and similarly, Curtis v. State, 78 Okl.Cr. 282, 147 P.2d 465; Wilkins v. State, 70 Okl.Cr. 1, 104 P.2d 289; 82 C.J.S., Statutes, § 348, page 725, note 9; and where one part of the statute is susceptible of two constructions, and the language of another part is clear and definite, and consistent with one of such constructions, and opposed to the other, that construction must be adopted which will render all clauses harmonious. 82 C.J.S. Statutes, § 348, page 728, note 13; State ex rel. Wallace v. Callow, 78 Mont. 308, 254 P. 187; Street v. Commercial Credit Co., 35 Ariz. 479, 281 P. 46, 67 A.L.R. 1549; In re Farmers State Bank of Ames, 181 Okl. 474, 74 P.2d 1166. Arrangement of provisions is immaterial if their relation and meaning are clear, but a position given to a section, may, however, be persuasive as to the legislative intent in the enactment thereof. 82 C.J.S. Statutes, § 348, page 730, notes 21, 23; Corstvet v. Bank of Deerfield, 220 Wis. 209, 263 N.W. 687. Thus confronted with different definitions, one containing a situation altogether legal and the other defining a relationship without legal sanction, we are compelled to look at the statute as a whole for the legislative intent. The position and relation of the terms as used in the statute must be considered together to ascertain the legislative intent. It appears, when so considered in its context that light may be found in the use of the term master, mistress, or servant. No ambiguity surrounds the use of the term master for it refers to a male person who could rise to the defense of his servant. It therefore naturally follows that if a female mistress is over a servant she too could rise to the defense of her servant or vice versa. The arrangement of the terms supports this conclusion; they should be read as master or servant, and mistress or servant. We are of the opinion that it was not the intention of the legislature to sanction the taking of a life in defense of an unlawful relationship rising to no higher level than that of paramour and concubine. To take the term mistress out of context and consider it in an isolated aspect would be to make it susceptible to the meaning contained in the second definition of mistress hereinbefore set forth and thereby give lawful recognition to an unlawful relationship as an excuse for murder. Such an interpretation would be out of harmony with the lawful sanctions surrounding the relationship of master or servant, etc. In fact it would impute to the legislature an intention to sanction such an unlawful relationship as an excuse for murder. We do not believe that such was the legislative intent. We are of the opinion that the legislature intended only to sanction the taking of human life on a lawful premise such as when done by the wife, the female head of a family, mistress of a school, or a female person having power or command over another in the relationship of servant, or vice versa, the servant in defense of the mistress. If the legislature had not intended that to have been the meaning of the statute it would have said master or servant, mistress, or in some other manner segregated or isolated the term mistress from the words master and servant. This they did not do but arranged them in the order of master, mistress or servant thereby limiting the term mistress by arrangement and association to one akin to that of master and servant. We are of the opinion that they very definitely had in mind such a relationship as regards the use of the term mistress. By no other interpretation can a lawful sanction as regards justifiable homicide by or in defense of a mistress be reached without doing violence to the law. We are therefore of the opinion that the trial court committed error, but error favorable to the defendant, in assuming that the relationship of mistress was such a relationship as that that the facts show to have existed between Mary Helen Johnston and the defendant. In Commonwealth v. Paese, 220 Pa. 378, 69 A. 891, 894, 17

L.R.A.,N.S., 795, the Pennsylvania court said:

"Courts do not sanction the increase of excuses for taking life, already too numerous, except under compulsion of weighty authority."

To this we would add, or when supported by clear logic and sound reason. No such impelling logic to extend the statute beyond what we believe to be its intended meaning confronts the court in this case. And no authority has been cited supporting such an extension herein.

▮ In light of the foregoing conclusions it would have been error for the trial court to have given the defendant's requested instructions 1, 5, 9, 12 and 16, in view of the fact, that said instructions were likewise based upon the false premise, as were the trial courts instructions, that Mary Helen Johnston occupied the position of mistress in her relationship to the defendant which entitled him to rise to her defense. Such is not the law, as applied to the facts in this case. We have carefully examined the instructions 11 and 13 and find No. 11 to be a correct statement of the law and the defendant's objection thereto is without substantial merit.

▮ Instruction 13 is rambling and by no means a model, but is not unfair to the defendant. As contended by the defendant, these instructions did not deprive the defendant of his right of self defense. Comparable instructions have been approved in Neill v. State, 89 Okl.Cr. 272, 207 P.2d 344; Alcorn v. State, 56 Okl.Cr. 156, 35 P.2d 735; Brantley v. State, 15 Okl.Cr. 6, 175 P. 51; Turner v. State, 4 Okl.Cr. 164, 111 P. 988. In fact the trial court's instructions are in complete harmony with the defendant's statement on the law of self defense. In the defendant's brief the law is correctly stated:

"There must generally be some act or demonstration on the part of the deceased which induced a reasonable belief on the part of the defendant that he was about to lose his life or suffer some great bodily harm. It is not sufficient that the deceased had the means at hand with which he could have in-

flicted the injury, if there was no act or demonstration which would indicate that he intended to do so. It is going too far, however, to lay down the general rule that an actual assault or battery must be committed, for such a rule would take away, or at least render almost unavailable, the right of self-defense, when firearms are used. Presenting, drawing, or attempting to draw such weapons furnishes, as a rule, such appearance of necessity." 26 Am.Jur. 255, Homicide, § 142.

In keeping with the foregoing rule the trial court in instruction 13, in substance, told the jury that in a homicide case that the danger to the defendant of death or great bodily injury need not be actual or real but that the defendant's belief of pressing danger must be a reasonable one, and that a reasonable cause for such belief is an overt act or demonstration made by the decedent that he intended to kill him or inflict serious bodily injury to him. Instruction 13 was in keeping with the foregoing principle as contended for by the defendant. But, the state's evidence discloses there was not the slightest act or demonstration by the decedent indicative of any attempt to injure the defendant or take his life. In State v. Radon, 45 Wyo. 383, 19 P.2d 177, 181, cited and relied on by the defendant it was said in part, "some act, of course, had to take place to give the appearance of danger, and to give the defendant reasonable ground therefor. But an actual assault or attack on the defendant was not necessary, if the circumstances gave reasonable ground for apprehension of imminent danger". Herein, the trial court so instructed the jury, but the jury found no such ground existed creating a basis sustaining the killing on the grounds of self defense.

▮ Further, the defendant complains that instructions 11 and 13, nowhere sought to "limit" the "difficulty" sought or voluntarily entered into as one sought for the purpose and with the intent upon the part of the defendant to take the life of the deceased. In Short v. State, 74 Okl.Cr. 272, 125 P.2d 227, this court was confronted with a similar instruction in a homicide

case without limitation as to the intent as affecting the right of self defense. At page 284 of 74 Okl.Cr., at page 233 of 125 P.2d, it was said:

"If he had been found guilty of murder, there might be substantial merit in this contention, but defendant was only found guilty of manslaughter in the first degree and not guilty of murder. Under the statute covering manslaughter, 21 O.S.1941 § 711, St.1931, § 2223, one who seeks or provokes a difficulty without any intention of killing or doing serious bodily injury to the deceased but only intending an ordinary battery is guilty of manslaughter. In view of this statute, the defendant could not have been prejudiced by the giving of the above instruction."

The defendant contended he did not go to the booth with the intention of killing Warner, but he was armed with a dangerous weapon. This case is clearly applicable to this contention, and the harmless nature of the instructions complained of.

Again, the defendant attacks instructions 11 and 13 for failure to instruct the jury to acquit the defendant if in the jury's mind there existed a reasonable doubt as to whether the defendant acted in self defense. We do not so interpret instruction No. 13. This contention under the conditions herewith presented does not impress the court, particularly in light of instruction No. 8 given by the trial court instructing on the question of reasonable doubt, in substance, saying that if the evidence offered by the defendant in support of justifiable homicide was strong enough to create in your minds a reasonable doubt of the defendant's guilt of the crime charged in the information it would be its duty to acquit him. This instruction we find was a fair statement of the law. In fact it was given under the authority of Title 22 O.S.1951 § 745, and was approved in Saulsbury v. State, 83 Okl.Cr. 7, 172 P. 2d 440, and numerous cases cited therein. The authority relied upon by the defendant on this contention, Anderson v. State, 90 Okl.Cr. 1, 209 P.2d 721, is not in point, for therein no instruction at all on reasonable doubt was given, and the reversal was grounded thereon.

In the foregoing connection the defendant complains of the trial court's use in the instruction of the words assault and assaulted. The use of these terms was approved in Mendenhall v. State, 18 Okl.Cr. 441, 451, 196 P. 736, 739. Therein the court said:

"We think that under the circumstances there was no error on the part of the court in the use of the language contained in the opening sentence of instruction No. 18, but if by any chance the language so used was susceptible of a prejudicial construction, it was fully corrected by the other instructions given, as above set out."

Such is the situation in the case at bar. As pointed out therein however it is well to keep in mind the distinction in a homicide case between assault and assault and battery. An assault sufficient to support a justifiable homicide need not be accompanied by a battery, for as was said in the Mendenhall case supra, the danger need not be real but only apparent. It should be noted that the defendant in his requested instruction No. 1 used the term "assailed". Under the definition of Websters International Dictionary these words assail and assault may be used interchangeably. Assail means assault and assault means assail. In Neill v. State, supra, the approved instructions used the terms "attack" and "attacked". This contention is obviously without merit.

To the same effect is the defendant's condemnation of the use of the term "a reasonably prudent person in like situation", contained in the trial court's instructions. Nevertheless the defendant admits the expression, " 'to excite the fear of a reasonable man' " has been approved in Adams v. State, 62 Okl.Cr. 167, 70 P.2d 821, 827, and Jamison v. State, 35 Okl.Cr. 302, 250 P. 548, and other Oklahoma cases. The defendant cites no authority to support his condemnation of the term. Moreover, he complains of the use of the term "prudent", but he cites no authority, and the Attorney General has found none in Oklahoma. To the contrary, see State v.

Hardin, 114 S.C. 280, 103 S.E. 557, approving the use of such terms.

We are of the opinion the instructions, as a whole, herein given, were fair to the defendant.

There are other contentions in the defendant's brief which we do not deem necessary to notice. It clearly appears the record herein as hereinbefore indicated would have sustained a verdict of murder. Such a verdict was probably obviated by proof of the violent and evil disposition of the decedent, and the erroneous instruction assuming under the statute, Title 21 O.S.1951 § 733, that Mary Helen Johnston bore the relationship of mistress to the defendant herein. In any event, the errors complained of are neither prejudicial nor harmful under the verdict of manslaughter. For all the foregoing reasons the judgment and sentence herein is accordingly affirmed.

POWELL, P. J., concurs.

JONES, J., concurs in conclusion as to affirmance of judgment, but dissents as to interpretation placed on meaning of word "mistress" and dissents to the fourth paragraph of the syllabus.